**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LAWSON PRINTERS, INC., Respondent.**

**No. 18531.**

United States Court of Appeals
Sixth Circuit.

March 12, 1969.

Fred R. Kimmel, N. L. R. B., Washington, D. C., for petitioner, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frank H. Itkin, Atty., N. L. R. B., Washington, D. C., on brief.

Joseph V. Wilcox, Albion, Mich., for respondent, Wilcox & Robison, Albion, Mich., on brief.

Before WEICK, Chief Judge, O'SULLIVAN and McCREE, Circuit Judges.

PER CURIAM.

This is a petition for enforcement of an order of the National Labor Relations Board. The Board's decision and order are reported at 159 NLRB 771 (1966). The Board adopted the findings and recommended order of the Trial Examiner who determined that respondent had engaged in numerous unfair labor practices in violation of Sections 8(a) (1) and 8(a) (3) of the Act.

Respondent challenges only the finding that on April 23, 1965 it laid off John Kewley, one of its employees, because of suspicion that he was involved in the union organization campaign then being carried on in its plant, and that on May 1 of that year it discharged him for the same reason.

Respondent operated a small printing plant and employed approximately sixteen non-supervisory personnel. Kewley was hired in February, 1964, and given the job of operating a small offset press called a "Chief 15". In November of that year respondent decided to make the metal plates which it used in its printing processes, and assigned Kewley to the darkroom. Previously, outside contractors had made these plates for respondent. In late March or early April, 1965, Kewley was transferred back to the Chief 15 press. A few days later, three weeks before his lay off, he was again transferred, this time, to a larger, more complicated press called a "Chief 20". Shortly thereafter, on April 6, respondent was informed that a substantial number of its employees had signed union cards.[1] Subsequently, on April 23, Kewley was laid off and was later discharged.

We agree with respondent that the record contains no direct evidence that it suspected Kewley's involvement in this campaign. We hold, however, that the Board and the Trial Examiner were justified in concluding that the employer's suspicion of union activity could reasonably be inferred from the circumstances surrounding his discharge.

After April 6, 1965, respondent was aware that its employees were involved in a union organization campaign.[2] Kewley was an active supporter of the union during this campaign. Respondent conceded during the hearing before the Trial Examiner that many of its su-

---

1. On April 6, 1965, respondent received a letter informing it that the Southwest Michigan District Joint Council of the International Printing Pressmen and Assistants' Union of North America had filed a petition for an election with the National Labor Relations Board. On the same day, respondent was visited by Robert D. Obenour, president of that union.

2. See note 1, *supra*.

pervisory employees had "indulged their natural curiosity by asking questions of the employees concerning the union." [3] Moreover, respondent does not dispute the fact that it engaged in numerous unfair labor practices, including the discharge or lay off of four employees other than Kewley, during the period from April 7 to June 13, 1965, because of its hostility toward the union.

Although respondent contends that Kewley was a bad employee, his general foreman, Frank Harvey, testified that Kewley had done a "very creditable job" on the Chief 15 before he was transferred to the darkroom. Also, only three months before his lay off, while he was working in the darkroom, respondent gave him an unsolicited twenty-five cent per hour wage increase. At that time Kewley was complimented by Harvey on his work.

Although on April 23 Harvey told Kewley that he was being laid off because there was no work for him, the Trial Examiner found that he then had about two more days of work to do. Respondent's president, William Lawson, testified at the hearing before the Trial Examiner that Kewley was laid off because the expenses he incurred while operating the darkroom were excessive and because he lacked sufficient experience to operate the Chief 20 press. The Trial Examiner found, however, that respondent transferred Kewley back to the press room because it needed a press operator and had found a photographer who it believed could satisfactorily take over the darkroom, and not because of its dissatisfaction with his services. We determine that this finding is supported by substantial evidence.[4]

On May 1, respondent notified Kewley that he had been discharged because of his inefficiency and low production. It now contends that he was discharged because of his insolence, refusal to work overtime and suspected sabotage of the press.

We hold that the Board and the Trial Examiner were justified in determining, in light of all of these circumstances, that respondent discharged Kewley because of its suspicion as to his union activity and that but for such suspicion it would have given him more time to develop his skill on the Chief 20 press. N.L.R.B. v. Tru-Line Metal Products Co., 324 F.2d 614 (6th Cir. 1963), *cert. denied*, 377 U.S. 906, 84 S.Ct. 1167, 12 L. Ed.2d 177 (1964); *see also* N.L.R.B. v. Mock Road Super Duper, Inc., 393 F.2d 432 (6th Cir. 1968). In *Tru-Line*, a case involving facts only slightly different from those of the instant case, this court also decreed enforcement of the Board's order, stating:

> It is settled law that the credibility of witnesses and reasonable inferences to be drawn from the evidence are matters for determination by the Board. 324 F.2d at 616.

A decree will be entered enforcing the order of the Board.

---

3. Trial Examiner's Decision, note 20, set forth in the Appendix to Petitioner's Brief at 40a.

4. See Trial Examiner's Decision, note 1, set forth in the Appendix to Petitioner's Brief at 10a.