**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MID STATE SPORTSWEAR, INC., Respondent.**

No. 26252.

United States Court of Appeals Fifth Circuit.

May 30, 1969.

Marcel Mallet-Prevost, Asst. General Counsel, N. L. R. B., Washington, D. C., John J. A. Reynolds, Jr., Director, Region 26, N. L. R. B., Memphis, Tenn., Marjorie S. Gofreed, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, John D. Burgoyne, Atty., N. L. R. B., for appellant.

Andrew C. Partee, Jr., Kullman & Lang, New Orleans, La., for appellee.

Before THORNBERRY and DYER, Circuit Judges, and FISHER, District Judge.

DYER, Circuit Judge:

This case is before us upon the petition of the National Labor Relations Board for enforcement of its order.[1]

■ It would add nothing to the jurisprudence under the Act, or be of precedental value for us to narrate a detailed exposition of the facts undergirding the Board's determination that the company violated Section 8(a) (1) of the Act. Suffice it to say that substantial evidence on the record considered as a whole sustains the Board's findings that the company promulgated a rule forbidding union solicitation in the plant at any time, which was plainly invalid, Republic Aviation Corp. v. N. L. R. B., 1945, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372; Republic Aluminum Company v. N. L. R. B., 5 Cir. 1968, 394 F.2d 405. Likewise, warning employees against joining the union, interrogating them about their union activities, threatening them with loss of employment and plant closing, and attempting to influence them by offers of benefits or threats of reprisal, to wear anti-union insignia, interfered with the employees' organizational rights. N. L. R. B. v. Finesilver Mfg. Co., 5 Cir. 1968, 400 F.2d 644; N. L. R. B. v. Southland Paint Co., 5 Cir. 1968, 394 F.2d 717; N. L. R. B. v. Borden Company, 5 Cir. 1968, 392 F.2d 412; N. L. R. B. v. Lone Star Textiles, Inc., 5 Cir. 1967, 386 F.2d 535; Brewton Fashions, Inc. v. N. L. R. B., 5 Cir. 1966, 361 F.2d 8, cert. denied 385 U.S. 842, 87 S.Ct. 95, 17 L.Ed.2d 75.

More serious questions are posed however by the Board's findings that employees Dunavent and Keeton were discharged because of their union activities in violation of Section 8·(a) (3) and (1) of the Act.

The company is located in Sumner, Mississippi, and is engaged in the manufacture of sportswear. It has about 68 employees. Dunavent worked as a utility girl, performing sewing operations on garments. Her sewing machine was in one of several lines of machines. In the usual course of her work there was no need for the operators to approach each other or to talk about their work.

· About July 1, 1966, Keeton obtained union authorization cards and with the help of Dunavent solicited other employees to sign. Dunavent distributed three cards on non-working time in the plant on July 11 and six cards outside of the plant. Five signed cards were returned to her on July 12, 1966. During this time the plant supervisors reported to the plant manager that there was unusual activity and talking between machine operators in Dunavent's section, with various operators congregating there and talking to her at some length. One of the supervisors heard rumors of union activity in the plant involving Dunavent.

On July 12, 1966, the manager called Dunavent into his office and told her that there was a lot of confusion, commotion and talk around where she worked. He told her that he was dismissing her and would check into the matter. He told her to come back on July 19 and he would tell her what he had found out. Later that day the manager received reports that some union solicitation had taken place and that the employees were talking about Dunavent having been fired for union activity.

On July 13, 1966, the manager posted an absolute no-solicitation rule and either on that day or the next decided to terminate Dunavent's employment. Nevertheless when Dunavent returned to the plant on July 14 the manager told her that he was still investigating the matter and she should see him on July 19. Dunavent reported again on July 19 and the manager told her he was still investigating and that she should come back a week

1. 168 N.L.R.B. No. 74, issued November 29, 1967.

later. On July 26 Dunavent returned but was given no further explanation and was never told why she was discharged. When she later applied for unemployment compensation the manager stated that Dunavent was discharged because of her violation of the no-solicitation rule.

The company contends that Dunavent's union activity was not known to it before her discharge, and that, in any event, she was discharged for misconduct. We are unpersuaded by the company's argument and conclude that the Board's finding of discriminatory discharge of Dunavent is supported by substantial evidence on the record as a whole.

It is undisputed that Dunavent was an experienced and valuable employee. Her work admittedly remained excellent until the date of her suspension. No showing was made that the talking and confusion interfered with production. We find no employee conduct that would justify dismissal.

■ The Examiner and the Board found that in the small plant here involved it was reasonable to infer that the rumors of union activity came to the attention of the supervisors and the manager. The company attacks the "small plant doctrine" as eliminating the necessity of proof of company knowledge. Of course it does not. A finding of knowledge of union participation may, however, be based on circumstantial evidence. N. L. R. B. v. Schill Steel Prod., Inc., 5 Cir. 1965, 340 F.2d 568. Furthermore, the Board does not stand on the small plant doctrine alone. In addition, the Board properly relied also for its inference of employer knowledge upon the timing of the discharge, the failure to give advance warnings to Dunavent, the failure to explain the reasons for her discharge to her at the time of her suspension, the later vacillations as to the reasons for the discharge, and the fact that her work was satisfactory up to the time of discharge, See e. g., N. L. R. B. v. Buddy Schoellkopf Prod., 5 Cir., 410 F.2d 82 (No. 25943, April 23, 1969);

United States Rubber Co. v. N. L. R. B., 5 Cir. 1967, 384 F.2d 660; N. L. R. B. v. Schill Steel Prod., *supra;* N. L. R. B. v. Plant City Steel Corp., 5 Cir. 1964, 331 F.2d 511.

■ Substantial evidence supports the Board's conclusion that the company violated Sections 8(a) (3) and (1) by discriminatorily discharging Dunavent.

■ The Board, contrary to the Trial Examiner's finding, concluded that Keeton was discharged because of her union activities. The Trial Examiner's contrary conclusion is a part of the record to be reviewed, and is a factor to be considered by us in assessing the substantiality of the evidence supporting the Board's decision. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; Dobbs House, Inc. v. N. L. R. B., 5 Cir. 1963, 325 F.2d 531, 537. Where the Examiner and the Board reach different conclusions, if the Board's findings are supported by substantial evidence on the record considered as a whole they must be sustained. N. L. R. B. v. Miami Coca Cola Bottling Co., 5 Cir. 1967, 382 F.2d 921, 923; N. L. R. B. v. Camco, Incorporated, 5 Cir. 1965, 340 F.2d 803, 808–809, cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339. With these principles in mind we assay the evidence.

Knowledge of Keeton's union activity, or at least a strong suspicion or belief that she was an adherent, is an essential element of a finding of violation. The Board premises the finding of company knowledge on (1) Keeton's part in the "confusion" (for which Dunavent was discharged) was noted by her superior; (2) she was warned by another superior about involvement in the union; and (3) the small plant doctrine. We consider these evidentiary factors seriatim.

Unlike Dunavent, Keeton deliberately carried on her solicitations outside of the plant, in an effort to keep her activities secret. The Examiner found and the record supports the conclusion that "there is a lack of clear proof that Respondent knew of Keeton's participation

in it" [the union activity]. Nevertheless the Board, in order to place Keeton in the so-called "confusion" around Dunavent's machine relies on the equivocal testimony of supervisor Middleton. She said that she would shake her head at girls talking in Dunavent's area and if they didn't stop she would walk up to their machine. She testified that she walked up to Keeton's machine. This hardly carries the day when it is considered in the light of the supervisor's unequivocal testimony that before Keeton's discharge she did not know that Keeton had anything to do with the union, and that she had not ever heard any rumors about Keeton and the union.

To raise an inference of company knowledge of Keeton's union activity the Board further relies on one conversation, characterized as a warning, that took place on the evening after Dunavent's discharge between Keeton and supervisor Jennings, friends of fifteen years, Jennings called Keeton's home to order some gasoline from Mr. Keeton. Mrs. Keeton answered the telephone and after the order was placed she asked Jennings what had happened to Dunavent that day, that she, Keeton, had heard a rumor about a union but that she had never heard or seen anything concerning a union. Jennings replied "that is good" and said "If I were you I would not get involved," further explaining that she did not want Keeton to get involved with other girls in any way which might affect Keeton's production. While the Board described this as a significant fact, and in the context of its decision makes it appear that the Examiner so found, and that the Board approved the finding; the Trial Examiner flatly stated that "I cannot charge Respondent with knowledge or suspicion of union activity on the basis of this talk." We agree with the Examiner that this wholly fails to support a finding of company knowledge.

Finally, the Board relies again on the small plant doctrine. "The smallness of the plant, or staff, may be material, but only to the extent that it may be shown to have made it likely that the employer had observed the activity in question. * * * This can have no application to an off-hour, off-the-premises, meeting, * * *." N. L. R. B. v. Joseph Antell, Inc., 1 Cir. 1966, 358 F.2d 880. See also N. L. R. B. v. Chicago Perforating Company, 7 Cir. 1965, 346 F.2d 233. As we noted in connection with Dunavent's discharge, reliance upon the small plant doctrine alone is insufficient proof of knowledge of union activity.

We conclude that on the record as a whole, there was no direct knowledge by the company of Keeton's union activity, nor are we able to draw any legally justifiable inference of such employer knowledge.

Moving now to Keeton's discharge, the Board reversed the Trial Examiner's finding that it was for improper work, and not because of her union or suspected union activity. The Board's decision rests mainly on its findings that prior to Keeton's discharge she was given no warning that her job was in jeopardy; that her offer to repair the bad work she had done was ignored; and that her faulty work was not as faulty as the Examiner had found it to be.

Keeton's job was to sew hoods and zippers into the backs of sports jackets. Her work had been satisfactory until about a month prior to her discharge. In fact, she had been complimented on her high production. But about a month or six weeks before her discharge defects in Keeton's garments began to increase, principally crooked labels and holes or loopings of unsewn hood bottoms. Her supervisor brought this to Keeton's attention and she was directed how to correct the sewing errors. During the last two weeks before Keeton was terminated the defects became so numerous that five other workers, a supervisor and some inspectors were relieved of their regular work to do repair work on Keeton's garments. After Keeton's dismissal the defects were gradually reduced and ultimately became rare. There was some conflicting evidence that during this period Keeton worked on repairs of other operators' work. The Examiner found

on the testimony that he credited however, that "The cogent proof of bad work over an extended period before discharge, with one specific attempt to help Keeton improve and constant reminders of continuance of defects, and the incidence of increasing bad work thereafter, militates against a finding that her discharge was abrupt or arbitrary." He also found that to have permitted Keeton to do repair work on her own garments, at the expense of her regular work, would have been economically unfeasible because it would have required a shutdown of the entire assembly line. We are convinced that the record fully supports these findings, and that the Board should not have overturned them.

█ The Board's reversal of the Trial Examiner is also said to be based upon the Examiner's erroneous reading of the record of Plant Manager Sullivan's testimony. The Examiner found that 15 percent of Keeton's total work had to be repaired, while the Board claims it to be 9 percent. From aught that appears, nine percent of an employee's work that requires repair is much too high. In any event, some unclear answers to obscure questions about percentages is not the measure. From a consideration of the record as a whole it is obvious that Keeton was doing poor work the two weeks before she was discharged. At best, sixty percent of her work was not proper even though about fifteen percent had to be fixed and the balance of borderline cases passed on. On the day of Keeton's discharge seventy-five to one hundred of her jackets with uneven margins and crooked labels were taken to Sullivan's office and pointed out to her. She did not question the accusation made that she was responsible for the bad work but simply offered to repair the jackets. We conclude that substantial evidence in the record as a whole fails to sustain the decision of the Board that Keeton was discharged because of suspected or known union activity.

The Board's order will be enforced as to the various unfair labor practices in violation of Section 8(a) (1) of the Act;

the Board's order will be enforced as to the discharge of Esther J. Dunavent in violation of Section 8(a) (1) and (3) of the Act; and enforcement of the Board's order will be denied as to the discharge of Clara Ruth Keeton.

Enforced in part and denied in part.