**BILL'S COAL COMPANY, INC.,**
Petitioner-Appellant,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent-Appellee.**

No. 73–1528.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 8, 1974.

Decided March 14, 1974.

Jeff Nix, Tulsa, Okl. (Ungerman, Grabel & Ungerman, Tulsa, Okl., on the brief), for petitioner-appellant.

Vivian A. Miller, Washington, D. C. (Michael S. Winer, Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, on the brief), for respondent-appellee.

Before LEWIS, Chief Judge, and SETH and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

Bill's Coal Company, Inc., an Oklahoma corporation engaged in the mining of coal near Welch, Oklahoma, filed a petition in this court seeking to set aside and vacate a decision and order of the National Labor Relations Board.[1] In its decision, the Board found that Bill's Coal had violated the provisions of 29 U.S.C. § 158(a)(1) and (3) and by way of remedy issued a cease and desist order as well as ordering certain affirmative relief. By cross-petition, the Board seeks enforcement of its order. This controversy arises out of the efforts of the International Union, United Mine Workers of America, to unionize Bill's Coal. The facts will have to be developed in some detail in order to demonstrate why the order of the N.L.R.B. should be enforced in part, but not in its entirety.

Bill's Coal operates several strip mines near Welch, Oklahoma, from which it mines, sells, and distributes coal. The mine was nonunion and the efforts to unionize it began in the early fall of 1971. Sometime in September 1971, three employees, namely, Tom Rogers, Orville Langley and Clifford Collins, travelled to Vinita, Oklahoma, and met there with a union organizer. As a result of this initial contact these three employees began to circulate union cards among the employees of Bill's Coal by contacting them at their homes after hours.

As will be developed later on, this attempt to persuade employees of Bill's Coal to sign union cards was a covert operation. However, Bill Patch, owner of a 50% interest in Bill's Coal and the individual owner in active charge of the mining operation, learned from sources outside his Welch mining operation of the efforts to unionize his company. In an attempt to head off unionization Patch called three meetings of his employees, which meetings were held on October 28, 30 and December 1, 1971. All of these meetings were held at the mine site and all were quite similar in character. At each meeting, Patch inquired of his employees as to

---

1. Reported at 203 N.L.R.B. (No. 35) (1973), 1973 CCH N.L.R.B. ¶ 25,308.

just who had signed union cards, and no one admitted signing. We need not here go into any lengthy recital of Patch's various statements made to his employees at these several meetings in his continuing effort to thwart unionization of his company. It is sufficient to note that, *inter alia,* Patch generally berated the United Mine Workers, declaring that he would never negotiate with it and that he "would go out the back door" if the "union should get in the front door." On one occasion he stated that if "I find that any of you old men signed a card, I'll whip your ———— not once, but every time I see you on Main Street."

Without going into a further summary of the evidence before the Board on this phase of the controversy, the Administrative Law Judge, and the Board, found, not surprisingly, that Bill's Coal had violated the provisions of 29 U.S.C. § 158(a)(1), which make it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their rights guaranteed under 29 U.S.C. § 157. The record amply supports the finding of the Board that there was a violation of 29 U.S.C. § 158(a)(1), and the Board's order that Bill's Coal cease and desist such unfair labor practices and post certain notices in connection therewith should be enforced. Indeed, this aspect of the employer's conduct is no longer seriously disputed.

The real controversy in this court concerns the layoff of nine employees on December 9, 1971. The Board found that this was a discriminatory layoff designed to discourage membership in the United Mine Workers in violation of 29 U.S.C. § 158(a)(3). As a remedy for this particular violation, the Board ordered that all nine employees be reinstated and made whole. In our view, the record, considered in its entirety, does not support the finding of discriminatory layoff, and accordingly the Board's order on this phase of the case should not be enforced. The facts relative to the layoffs will be developed as a part of our general discussion of the layoff issue.

So that the respective positions of the parties may be understood at the outset, it was the position of Bill's Coal that the layoff of nine of its employees was an economic necessity and that in determining which nine employees would be laid off, Bill's Coal was guided by seniority within job classification. As indicated, the Board, with one member dissenting, found that the layoffs were discriminatory and motivated, at least in part, by a desire on the part of Bill's Coal to discourage membership in the United Mine Workers in violation of 29 U.S.C. § 158(a)(3). Let us proceed then to a consideration of the layoff issue.

As a starting point in our discussion of the layoff issue, the Administrative Law Judge found that during the latter part of 1971, the business of Bill's Coal was in such an "economic slump" as would justify a layoff and the Board generally approved this finding. Certainly the record offers abundant proof of the declining economic condition of Bill's Coal at the time of the December 9 layoffs. It had then recently lost all its contracts with customers but one and, although it still retained its one prime customer, that customer was only ordering the minimum amount called for by his contract and was at the time some $200,000 in arrears in payments. So, in this court, at least, there is no serious dispute but that a layoff on December 9 was economically justified. However, it is the Board's position that Bill's Coal discriminated in its selection of the nine to be laid off in an effort to discourage membership in the union in violation of 29 U.S.C. § 158(a)(3).

In support of its finding of discriminatory layoff, the Board points first to the fact that all nine employees who were laid off on December 9, 1971, had signed union cards. We have held that discrimination may not be inferred from the mere fact that a discharged employee was a union member. N. L. R. B. v. Western Bank & Office Supply, 283 F.2d 603 (10th Cir. 1960). In that case,

however, only one employee was involved, whereas in the instant case we are concerned with nine employees. So, does the fact that all nine employees who were laid off had signed union cards permit, in and of itself, the inference of discrimination and does such fact, in itself, constitute substantial evidence of discriminatory layoff? Under the circumstances of this case as disclosed by the record before us, we conclude that it does not.

The record before us is silent as to just how many of the employees of Bill's Coal had signed union cards. There were apparently some forty-odd employees of Bill's Coal, some employed at the mine proper and others employed to haul the coal to the customer. If the nine employees who were laid off were the only employees who had signed union cards, such fact in and of itself might well be sufficient to support an inference of discrimination. However, if, for example, all, or virtually all, of the employees had previously signed union cards, then the fact that the nine employees who were laid off had all signed union cards would be of little significance. Rocky Mountain Natural Gas, Inc. v. N. L. R. B., 326 F.2d 949 (10th Cir. 1964).

As above indicated, in the instant case we do not know how many of Bill's Coal employees signed union cards, so the fact that the nine laid off were signees of union cards would not in itself support a finding of discrimination, though such may, of course, be considered by the Board, along with all the other evidence, in making its finding as to whether Bill's Coal in its selection of the employees to be laid off acted discriminatorily. N. L. R. B. v. Sequoyah Mills, Inc., 409 F.2d 606 (10th Cir. 1969). Let us consider some of the other evidence.

Bill Patch testified that when he laid off the nine employees on December 9, 1971, he did not know whether any of them had signed union cards, though he conceded that shortly after the layoffs he had made the remark that he had

probably "thinned out" their ranks. This latter remark is of course subject to varying interpretation. The nine employees laid off all testified before the Board, and they all agreed that they had attempted to keep secret the fact that they had signed union cards, and that such secrecy was a matter of union policy at the moment.

Patch testified that on or about October 1, 1971, three employees had stated that they had just signed union cards, and that he had argued with them about their signing. These three, however, were not among the nine laid off on December 9. Additionally, at the December 1 meeting, two employees refused to sign a petition disavowing the union, which petition Patch sought, unsuccessfully, to have circulated among his employees. In a moment of anger, Patch fired these two on the spot. However, each was rehired moments later after tempers had subsided, and neither of these two was among the nine laid off on December 9. This was about the extent of Patch's knowledge as to which of his employees might have signed union cards.

Additionally, Patch testified as to the economic slump his company was experiencing during the second half of 1971. He said that the reason for the layoff was economic necessity, and that in determining which employees should be kept, and which nine should be laid off, he applied the rule of seniority within job classification, and that the nine laid off had the least seniority. He denied that in selecting the nine he was attempting to punish those who had signed union cards and thereby chill the efforts of all to unionize his company.

The crux of this layoff issue is whether the finding of the Board that Bill's Coal acted discriminatorily in its determination of which nine employees would be laid off finds substantial support in the record. Our study of the record convinces us that there is not such support. In the first place, proof of an employer's knowledge of his employee's union activity is a prerequisite

to the establishment of a discriminatory layoff or discharge. Dubin-Haskell Lining Corp. v. N. L. R. B., 375 F.2d 568 (4th Cir. 1967), reheard en banc, 386 F.2d 306 (4th Cir. 1967), cert. denied, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968). Such proof is singularly lacking in the instant case. In this connection we recognize that proof of such knowledge of an employee's union activity, as well as proof of a discriminatory layoff, is seldom established by direct evidence, and may be, and generally is, shown by circumstantial evidence. *See* Betts Baking Co. v. N. L. R. B., 380 F.2d 199 (10th Cir. 1967), and N. L. R. B. v. Tepper, 297 F.2d 280 (10th Cir. 1961). However, the circumstances of a given case must do more than create just a suspicion or surmise, and must amount to substantial evidence from which a reasonable inference of discriminatory discharge may be drawn. N. L. R. B. v. Western Bank & Office Supply, *supra.* In this general regard, we echo our then Chief Judge Murrah's observation that no good purpose is served by attempting to reconcile the numerous decisions dealing with employer motivation in the discharge or layoff of an employee, since each necessarily requires analysis in the light of its own particular facts. Betts Baking Co. v. N. L. R. B., *supra.* Applying these principles to the instant case, we conclude that the record, considered in its entirety, simply does not support a finding of a discriminatory layoff.

One other matter merits comment. The Administrative Law Judge and, to a lesser extent, the majority of the Board, indicated that in finding a discriminatory layoff reliance was placed on the so-called "small plant" doctrine. The small plant doctrine as first announced was that in a small plant it is a reasonable inference that evidence of union activity brought to the attention of a subordinate management official will in turn be brought to the attention of higher management officials. Such inference bears on the question as to whether, in a given case, the employer knows of an employee's union activities and then proceeds to discharge the employee because of such activity. This doctrine was reputedly fathered by the First Circuit in National Labor Relations Board v. Abbott Worsted Mills, 127 F.2d 438 (1st Cir. 1942).

The doctrine has been later redefined by the First Circuit in N. L. R. B. v. Joseph Antell, Inc., 358 F.2d 880 (1st Cir. 1966). In *Antell,* the court stated that the smallness of a plant, or a staff, may be material as bearing on the knowledge on the part of the employer of an employee's union activities, but only to the extent that it may be shown to have made it likely that the employer observed, or otherwise learned about the activity in question. The court went on to state that the doctrine had no application to an off-hour, off-the-premises, meeting. *See also* Amyx Industries, Inc. v. N. L. R. B., 457 F.2d 904 (8th Cir. 1972), and Board decisions cited therein.

Apparently the small plant doctrine has not heretofore been considered in any great detail by this court, at least not to the extent that it has been presented in the instant case. We did make passing reference to the small plant doctrine in American Sanitary Products v. N. L. R. B., 382 F.2d 53 (10th Cir. 1967), where the small plant of the employer was but one of the many facts and circumstances which in that case supported a finding of discriminatory layoff. *See also* N. L. R. B. v. Meinholdt Manufacturing, Inc., 451 F.2d 737 (10th Cir. 1971).

In our view, the small plant doctrine plays, at most, a very minor role in the instant case. Evidence of union activity at the mine site was minimal, if not virtually nonexistent. As indicated, about the only union activity involved was the signing of union cards and such occurred clandestinely and off the mine site. Most certainly, then, the small plant doctrine would not in itself permit the inference in the instant case that Patch knew that the nine employees who were laid off had all signed union cards and that these nine were laid off be-

cause they had signed union cards. *See* in this regard N. L. R. B. v. Meinholdt Manufacturing, Inc., *supra,* and the decisions cited therein, and Phillips Industrial Components, Inc., 190 N.L.R.B. 184 (1971).

In sum, then, though there admittedly is some evidence looking towards discriminatory layoff, certainly, for example, Patch had antiunion animus, nevertheless, in our best judgment, the finding of discriminatory layoff does not find *substantial* support in the record. N. L. R. B. v. Beech Aircraft Corp., 483 F.2d 51 (10th Cir. 1973). Accordingly, the Board's request that Bill's Coal be directed to reinstate the nine employees laid off on December 9, 1971, is denied and the Board's order in this regard is vacated. However, the Board's request that its order directing Bill's Coal to cease and desist interfering with, restraining and coercing its employees in violation of 29 U.S.C. § 158(a)(1) is granted and that portion of the Board's order shall be enforced.