**BOREL RESTAURANT CORPORATION, d/b/a Rusty Scupper Restaurants, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–1785.**

United States Court of Appeals, Sixth Circuit.

April 2, 1982.

Gregory P. Szuter, Schwartz, Einhart & Simerka, Cleveland, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Howard Perlstein, Washington, D. C., Henry Shore, Director, Region 6, N. L. R. B., Pittsburgh, Pa., for respondent.

Before KEITH and JONES, Circuit Judges, and PECK, Senior Circuit Judge.

## ORDER

Petitioner Borel Restaurant Corporation d/b/a Rusty Scupper Restaurant ("Employer") seeks review of an order of the National Labor Relations Board ("the Board") finding that it violated §§ 8(a)(1) and (a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1) and (a)(3), in discharging one of its employees. The Board has cross-petitioned for enforcement.

This matter was heard by an Administrative Law Judge ("ALJ") on December 17 and 18, 1979. In his order of June 5, 1980, the ALJ found that the Employer violated §§ 8(a)(1) and (a)(3) of the Act by discharging Passanante. The Board adopted the conclusions of the ALJ. The Board's order, issued on August 27, 1980, is reported at 251 NLRB No. 134.

Patrick Passanante ("Passanante") was employed as a waiter by the Employer from June 1977 until his termination in May 1979. During this tenure, specifically in December 1978, Passanante, along with his co-worker, Joe Balsamo, initiated a union organizing campaign. On March 20, 1979, the Employer settled an unfair labor charge with the Regional Director on a non-admission basis. The charge involved the defendant, Employer, and among others, Passanante.

All the times relevant to this action, the following rule was in effect as set forth in Borel's Employees' Manual:

> No employee will be allowed to drink while on duty. Furthermore, under no circumstances can an employee come to work under the influence.

Additionally, the Pittsburgh facility had a waiter's manual which provided, "No smoking or drinking during duty." Over the years, several disciplinary sanctions have been imposed on individuals failing to comply with the no-drinking rule. For example, when the restaurant initially opened, Ken Mallen, a waiter, and John McGrath, a cook, were fired for drinking while they had duties to perform. In 1979, Tony Kloptowski, a waiter, was given, as punishment, a schedule of five days of Earlier Waiter (E.W.) shifts, when he was caught drunk on the job. An E.W. shift schedule is the most onerous penalty short of discharge since an employee on E.W. loses tip income generally attendant to later shifts.

In early 1979, Donald Mang was brought to Pittsburgh by the Employer to serve as the new night floor manager. During his first duty shifts on the job, Mang approached his supervisors—McGill and Hamilton—and requested to have a meeting with the night employees in order to give his views of management and to tell his crew how he would run his ship. His theme was getting "back to basics."

During this meeting, held on May 22, 1979, Mang went through both the Employer's rule and waiter manuals and generally spoke about service, morale, and uniforms. Mang also placed particular emphasis on the basic rules of no eating, smoking and drinking. Allegedly, district manager Dave McGill warned the employees that drinking on the job would lead to their termination.

Later, someone initiated questions concerning the imposition of a penalty on Tony Kloptowski (the waiter discharged for drinking). Passanante, referring to an earlier meeting, requested a clarification of the policy. In the earlier meeting, management had stated that the schedule would not be used as a disciplinary device in the future. At this point, general manager McGill slammed his papers on the desk and told Passanante that he [Passanante] made his blood pressure rise and that whatever happened between Mang and Kloptowski was their business. The meeting continued and adjourned without further incident.

Later during the same evening, Mang discovered two employees, Weber and Keller, drinking beers. Mang's only reaction to this incident was to remind these individuals that they had work to do and were required to "sign out" before they could drink.

Two days later, on May 24, 1979, Passanante invited Carol Swindell, a waitress, to meet two customers who were pleased by Passanante's service. The customers asked Swindell to sit down and have a drink. She and Passanante did so and drinks were ordered. At that moment, Passanante had no immediate duties to perform. As Passanante, Swindell and the customers sat, a group of patrons who had been served earlier by Passanante paid their check and left a tip. Passanante had completed his required 25 set-ups (each waiter/waitress was required to place silverware into a napkin, then into a glass and this ensemble was called a set) and had filled out his tip income information paperwork.

Swindell, on the other hand, had customers waiting for their meals at two tables. She was also on the L.C. schedule which required her to perform "clean-up" duties after the restaurant was closed.

What occurred next is a matter in considerable dispute. According to Swindell, she left the table to retrieve an order from the kitchen and ran into night manager Mang. She then informed him that she and Passanante were having a drink with two of his customers, and Mang replied that it was okay so long as she informed him of her activities. Mang then allegedly questioned Swindell concerning Passanante's activities; she replied that he should direct comments to him. Swindell then returned to the table and told Passanante that he should talk to Mang.

Passanante recounted that he approached Mang and informed him that he had completed his duties and needed to be signed out. He also told Mang that he was now seated with two of his customers having a drink. Mang supposedly replied that it was okay as long as he informed him of his actions.

Mang, on the other hand, asserts that he was eating dinner when he saw Swindell and Passanante sitting at the table drinking and smoking. When he got up, Swindell approached him and said she hoped he didn't mind what she was doing. Mang allegedly stated that he was very upset and reprimanded Swindell. She apologized to him and did not return to sit with Passanante. He further stated that upon being approached by Passanante, Mang inquired whether the May 22 meeting had had any effect on him and subsequently reprimanded him.

Mang made an entry in his daily report of May 24, 1979 that Passanante had been caught drinking and was given a reprimand. The notation "Next strike three-out" was also entered.

On May 26, two days following the drinking incident, Mang summoned Passanante to his office where he met Hamilton and McGill. According to Passanante, he was told that Management did not like his attitude and that he was being terminated. When Passanante pressed for a reason, Hamilton alluded to the drinking incident two days earlier. When Passanante asserted that it was customary for drinking to occur and that Swindell had been drinking, Hamilton allegedly remarked that he did not care and subsequently uttered, "I got rid of Joe Balsamo [the other union organizer] and now I'm rid of you." The management personnel present testified that no reference to Balsamo was ever made. The instant suit followed.

■ Section 8(a)(3) prohibits the discharge of an employee which is motivated by the employee's union activity. Where, as here, both a "good" reason, i.e., violation of the no-drinking rule, and a "bad" reason, a violation of § 8(a)(3), is alleged for an employee's discharge, the issue is resolved by applying the *Wright Line* test. *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, enf'd. 662 F.2d 899 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). In *Wright Line*, the Board developed a new test relying heavily upon the decision of the Supreme Court in *Mt. Healthy City School*

*District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy*, the Supreme Court was faced with the plight of an untenured school teacher (Doyle) who had been refused reinstatement by the school board. The school board presented Doyle with two reasons: his use of obscene gestures and language in the school's cafeteria and his conveyance of his reactions to a change in school policies on a local radio program. The district and appellate court, utilizing an "in part" analysis, granted judgment for Doyle. The Supreme Court reversed and ruled that the school board must be given an opportunity to establish that its decision to renew Doyle's contract would have been the same if the protected activity, i.e., speaking on the radio show, had not occurred. The Court set out the following test:

> Initially, in this case, the burden was properly placed upon [the employee] to show that his conduct was constitutionally protected and that his conduct was "a substantial factor"—or to put it in other words—that it was a "motivating factor" in the [school board's] decision not to rehire him. [The employee] having carried the burden, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct. 429 U.S. at 287, 97 S.Ct. at 576.

The court rejected the "in part" and "dominant motive" tests as inadequate and found that the legislative history of the Act sanctions the burden shifting of the burden as outlined in *Mt. Healthy*. Within the context of § 8(a)(3) violations, the Board developed a mirror image analysis to be applied as follows:

> First we shall require that the General Counsel make a prima facie showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision. Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

251 NLRB at 1089. *See NLRB v. Lloyd A. Fry Roofing Co.*, 651 F.2d 442 (6th Cir. 1981).

An application of the *Wright Line* test to the present factual situation reveals that there is substantial evidence supporting the Board's decision in finding a violation of § 8(a)(3). The record clearly establishes the Employer has failed to carry its burden of demonstrating that the discharge of Passanante would have occurred in the absence of his union activity.

In rebuttal, the Employer asserts that Passanante was discharged solely because of his violation of the no-drinking rule. The Employer attempts to distinguish its treatment of Swindell's violation by asserting that (1) she was absent from the "back to basics" meeting of May 22, 1979; (2) she apologized to Mang; and (3) she had a good work record. Even a cursory review of this record would establish that the Company's arguments and assertions are without merit.

Accordingly, and upon consideration of the arguments of counsel, the records and briefs filed herein, we affirm the Board's order, 251 NLRB No. 134, we also grant the Board's January 26, 1981 cross-application for enforcement.