**NATIONAL LABOR RELATIONS BOARD, Petitioner, Cross-Respondent,**

v.

**HEALTH CARE LOGISTICS, INC., Respondent, Cross-Petitioner.**

Nos. 85–5207, 85–5276.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 8, 1985.

Decided Feb. 27, 1986.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., William Bernstein (argued), Washington, D.C., Emil C. Farkas, Director, N.L.R.B., Region 9, Cincinnati, Ohio, for petitioner, cross-respondent.

James D. Kurek (argued), Buckingham, Doolittle, Burroughs, Akron, Ohio, for respondent, cross-petitioner.

Before MERRITT and WELLFORD, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.

WELLFORD, Circuit Judge.

The National Labor Relations Board ("NLRB") seeks enforcement of its order, adopting the ALJ's finding that National Health Care Logistics, Inc. ("the Company") committed unfair labor practices by discharging employees Jon Jacobs, Mark Cox, and Robert Fox to discourage union activities among its employees. The Company cross appeals the decision.

At all times relevant to this case, the Company was engaged in the manufacture of medical cabinets in Circleville, Ohio. The physical plant was small, consisting of a 2000 square feet, one story building about the size of a three-car garage, and was divided into an open manufacturing area, a paint room, and a restroom. Gary Sharpe, the Company president, lived a short distance from the plant.

In June 1983, several months before the alleged unfair labor practices, Sharpe allegedly told one of the discharged employees, Jon Jacobs, that if a union ever came into the plant, he would close it down. The comment was allegedly made in connection with an argument Sharpe had with another employee about a workers' compensation claim.

The Company's workforce originally consisted of three to four fulltime employees. In the fall of 1983, however, a business growth required expansion of the workforce, resulting in the employment of six to eight additional workers. This expansion pushed the Company into financial difficulties, with sizeable losses suffered through February 1984. In mid-October 1983, the employees began discussing the possibility of union representation. Jacobs initiated these discussions at the plant with employee Mark Cox and shop supervisor Erwin. Between mid-October and November 7, several additional discussions took place at the plant among Jacobs, Cox, Erwin, and other employees. Jacobs led these discussions and spoke in favor of union representation with several employees, including Cox and Robert Fox, who expressed an interest in union representation.

On Monday, November 7, 1983, Jacobs telephoned a representative of the United Steel Workers of America ("the Union") during a work break. He arranged for the union representative to meet with the employees a few days later. After completing his call, Jacobs returned to the work area and reported to the employees that the Union agent would be in town and that anyone interested should meet with him. On the evening of November 7, Sharpe decided to terminate employees Jacobs, Cox, and Fox. The next day, Tuesday, November 8, operations manager Salyers informed each of them that they were terminated.

Subsequently the discharged employees filed separate unfair labor practice charges, later consolidated, against the Company. The Board found, in conformity with the ALJ, that the Company violated

sections 8(a)(1) and (3) of the Act (29 U.S.C. §§ 158(a)(1) and (3)) by discharging employees Jacobs, Cox, and Fox in order to discourage union activities.[1]

In its cross petition, the Company asserts that no violation occurred as to Jon Jacobs because he was a supervisor within the meaning of the National Labor Relations Act and therefore not a covered employee. Alternatively, the Company argued that the Board's decision is not supported by substantial evidence because all three discharged employees, including Jacobs, had been terminated for legitimate business reasons and not as a pretext for an unfair labor practice. We enforce the Board's order as to Jacobs and Cox, but deny enforcement of the NLRB order regarding the discharge of Fox.

## I

29 U.S.C. § 157 accords employees "the right to self-organization, to form, join, or assist labor organization...." Excluded from the Act's protection are supervisors who are by the Act's definition not deemed to be employees. 29 U.S.C. § 152(3). *See ITT Lighting Fixtures, Division of ITT Corp. v. NLRB*, 719 F.2d 851, 857–58 (6th Cir.1983) (discussing consequences of statutory distinction between an "employee" and "supervisor"). Supervisors are defined at 29 U.S.C. § 152(11) to be:

> any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

■ The Company argues that Jacobs was a supervisor because he directed the work of other shop employees and received a promotion from general laborer to the position of assistant shop supervisor, pointing to a promotion of Jacobs to supervisor on a short-lived second shift formed approximately two months before his discharge. When the second shift was discontinued, however, Jacobs returned to his position as assistant shop supervisor where his duties were expanded to include solo field maintenance trips and inventory control.

Although noting that Jacobs was a supervisor within the Act's meaning during his short-term control over the second shift, the ALJ determined that at the time of his discharge, Jacobs was not acting as a supervisor in his position as "assistant shop supervisor." The ALJ stated that neither Jacobs' job title as assistant shop supervisor nor a conclusory statement that Jacobs possessed any of the enumerated supervisory powers under 28 U.S.C. § 152(11) was sufficient to establish that Jacobs was a supervisor within the meaning of the Act, relying upon *Saladmaster Corp.*, 216 NLRB 769 (1975) and *United States Gypsum Co.*, 118 NLRB 20 (1957).

Since the question of supervisory status is a mixed question of fact and law, the Board's finding in that respect will be upheld if it is supported by substantial evidence on the record. *NLRB v. Lauren Manufacturing Co.*, 712 F.2d 245, 247 (6th Cir.1983). On this issue, we defer to the Board's expertise on a charging party's status "if it has 'warrant [support] in the record' and a reasonable basis in law." *Beverly Enterprises v. NLRB*, 661 F.2d 1095, 1099 (6th Cir.1981) (quoting *NLRB v. Hearst Publications, Inc.*, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944)).

The exercise of any one of the enumerated powers combined with "independent judgment" is enough to make one a su-

---

**1.** The Board order requires the Company to cease and desist from the unfair labor practices found, and from in any like or related manner interfering with, restraining, or coercing employees in exercise of rights guaranteed by section 7 of the Act (29 U.S.C. § 157). Affirmative-ly, the Board's order requires the Company to offer Jacobs, Cox, and Fox reinstatement, to make them whole for any losses suffered as a result of the discrimination against them, to expunge any reference to the discharges from their files, and to post an appropriate notice.

pervisor.... It has been held that the mere fact that an employee may give some instructions to others, or that he may command their respect, does not indicate that he must identify with the interest of the employer rather than the employees; the test must be the significance of his judgments and directors.... [T]he specific job title of the employer is not controlling. Courts must examine the employee's actual job responsibility, authority and relationship to management.

*NLRB v. Wilson-Crissman Cadillac, Inc.,* 659 F.2d 728, 729–30 (6th Cir.1981) (citations omitted).

The record in this case supports the Board's finding that Jacobs did not possess sufficient indicia of supervisory status under the Act. The Company does not contend—and the record is devoid of evidence—that when acting as assistant shop supervisor, Jacobs ever hired, transferred, suspended, laid off, recalled, promoted, discharged, assigned, rewarded, disciplined, or adjusted the grievances of other employees or that he had the authority to do so. Nor does the record show that Jacobs possessed or exercised authority to direct and control the work of other employees. The record shows rather that Jacobs spent approximately thirty to forty percent of his time traveling to the facilities of the Company's customers, where he performed field maintenance on products purchased from the Company. He traveled and worked alone and thus had no employees to supervise. Although Jacobs had the discretion to make decisions and purchase materials in the course of performing this duty, his discretion was unrelated to the work of fellow employees and does not demonstrate statutory supervisory status. The record further shows that when Jacobs was not traveling, he divided his work at the plant between inventory control work and production assembly work on the Company's products. Inventory control, like the field maintenance work, was performed by Jacobs alone and did not involve exercise of supervisory authority.

The Company contends that Jacobs was a supervisor because he directed the work of other employees in the course of his assembly work on the first shift, but the record does not support this contention. The occasional instructions to others given by Jacobs were routine in nature and did not involve any use of independent judgment. Rather, as the Board found, Jacobs either passed on routine instructions from operations manager Salyers or advised other employees how to do their work based on his seniority and experience. Employees generally knew what jobs to perform each day and were all expected to help one another out when necessary. We find support in the record for the finding that the limited and routine authority exercised by Jacobs did not confer supervisory status upon him.

An additional factor supports this finding. Since only seven or eight other employees were in the shop as well as two other supervisors, Salyers and Erwin, counting Jacobs as a supervisor would create a ratio of one supervisor to two or three employees, one "clearly out of balance." *Memphis Furniture Manufacturing Co.,* 232 NLRB 1018, 1021 (1977), *enforced* 616 F.2d 964 (6th Cir.1980). Jacobs earned $3.65 per hour, moreover, the same as employee Cox and less than the $3.90 per hour paid supervisor Erwin.

In sum, the Board's determination that at the time of his discharge Jacobs did not possess or exercise any of the supervisory authorities enumerated in the Act is supported by substantial evidence. Accordingly, Jacobs was entitled to the protection of the Act as an employee.

## II

The Company next contends that it had no knowledge of union-related activities and that even if it had knowledge, it discharged these employees because of the economic instability of the Company and for poor work performance. In *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983), the Supreme Court stat-

ed that an employer commits an unfair labor practice by discharging an employee for participating in protected concerted activities if the employer "has no other basis for the discharge, or if the reasons that [the employer] proffers are pretextual...." Since the Company offered ostensibly legitimate reasons for discharging these employees, the Board had to "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980), *enforced* 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *quoted with approval in Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188, 1192 (6th Cir.1985); *Borel Restaurant Corp. v. NLRB*, 676 F.2d 190, 193 (6th Cir.1982). Since an employer is unlikely to acknowledge an improper motivation in its decision to terminate employees, the NLRB may rely on circumstantial evidence and all relevant facts surrounding an employer's action to establish knowledge of employees' pro-union activities as well as to infer an unlawful motive. *See, e.g., Dayton Typographic*, 778 F.2d at 1192–93; *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985); *NLRB v. Lawson Printers, Inc.*, 408 F.2d 1004, 1005 (6th Cir.1969).

Throughout the proceedings the Company's president and supervisors have denied any knowledge about employee meetings regarding possible union representation. In discrediting these denials, the ALJ applied the "small plant doctrine" which the ALJ stated as permitting a rebuttable *presumption* of employer knowledge "where the facility is small and open, the work force is small, employees made no great effort to conceal their union conversations, and management personnel are located in the immediate vicinity of the protected activity."

■ Although we believe the ALJ accorded the "small plant" doctrine too much weight in deeming it a rebuttable presumption, the doctrine is applicable in this case

as a circumstance indicating that the employer had some knowledge or indication of union activities and would constitute some support for a finding that the union discharged the employees because of anti-union animus. The essence of the small plant doctrine "rests on the view that an employer at a small facility is likely to notice union activities at the plant because of the closer working environment between management and labor." *Alumbaugh Coal Corp. v. NLRB*, 635 F.2d 1380, 1384 (8th Cir.1980); *see also NLRB v. Buddies Supermarkets, Inc.*, 481 F.2d 714, 722 (5th Cir.1973); *Amyx Industries, Inc. v. NLRB*, 457 F.2d 904 (8th Cir.1972). The small size of the facility, however, does not give rise to a *presumption* of knowledge that an employer must rebut to prevent establishment of the Board's prima facie case. Rather, the doctrine permits an inference of employer knowledge only if the Board establishes by other evidence, direct or circumstantial, that an employer had reason to notice the union activities in the facility. *See, e.g., NLRB v. American Spring Bed Manufacturing Co.*, 670 F.2d 1236, 1245 (1st Cir.1982); *Alumbaugh Coal*, 635 F.2d at 1384–85; *Bill's Coal Co. v. NLRB*, 493 F.2d 243, 247–48 (10th Cir.1974); *NLRB v. Mid State Sportswear, Inc.*, 412 F.2d 537, 539–40 (5th Cir.1969); *NLRB v. Joseph Antell, Inc.*, 358 F.2d 880, 882 (1st Cir.1966). Other evidence necessary to permit an inference of employer knowledge is often the same evidence allowing an inference that the Company was motivated by anti-union animus. Such relevant evidence includes: (1) open discussions about a union on the premises during work hours; (2) timing of the discharge; (3) adequacy of the employer's reasons for discharge; and (4) employment of a replacement soon after a discharge for asserted economic reasons. *See, e.g., American Spring Bed*, 670 F.2d at 1245; *Alumbaugh Coal*, 635 F.2d at 1384–85; *Bill's Coal*, 493 F.2d at 247; *Mid-State Sportswear*, 412 F.2d at 539–40.

■ We are satisfied that evidence in the record coupled with the small plant doctrine permits an inference of employer

knowledge of union activities and anti-union animus. In this case the credited testimony revealed that the employees' discussions about union representation occurred in the main room of the small manufacturing facility during the workday with no real effort made to conceal these conversations from management and supervisory personnel who worked daily in and about the main shop. The ALJ noted that an inference of employer knowledge could be drawn from the timing of the decision to terminate these employees mid-week, the evening after Jacobs told the other employees that a union representative would be brought to the plant later in the week. Furthermore, the employer's reasons for discharging Jacobs and Cox could be deemed both inconsistent and inadequate. Finally, despite its alleged financial straits, the Company hired one new employee on November 21, 1983 only two weeks after the discharge in question, and then the Company hired other employees during January of 1984. This evidence supports a finding of employer knowledge of union activities as well as the Company's anti-union animus.[2] Thus, the Board satisfied its burden of establishing a prima facie case that the Company unlawfully discharged these employees.

### III

Once the Board established a prima facie case, the burden of persuasion then shifted to the Company to establish that Jacobs, Cox, and Fox would have been discharged absent the protected union-related activities. *See Transportation Management,* 462 U.S. at 401–03, 103 S.Ct. at 2474–75; *Dayton Typographic,* 778 F.2d at 1193;

*NLRB v. E.I. DuPont de Nemours,* 750 F.2d 524, 528–29 (6th Cir.1984); *NLRB v. Baja's Place,* 733 F.2d 416, 421 (6th Cir. 1984). We conclude that substantial evidence does support the Board's finding that Jacobs and Cox were discharged for their participation in protected activities, but we reject the NLRB's determination that the Company committed an unfair labor practice in terminating Fox.

The Company claims that its poor financial condition compelled it to reduce its payroll costs by discharging three employees, and that it chose Jacobs, Cox, and Fox because of poor work performance. As the Board found, the record does reflect the Company's financial instability in the months prior to the November 8 discharges. The Company nevertheless continued to have financial difficulty at least through February 1984. As previously mentioned, however, the Company hired one new employee only two weeks after it discharged three employees assertedly for economic reasons, and thereafter hired three more employees within two months. The fact that the Company, despite continued economic problems, replaced the three discharged employees within less than two months supports a finding that financial woes were not the reason for the discharge.

In addition to its economic justifications, the Company stated that the work performance or attitude of the three men discharged supported their termination. The Company claimed that Jacobs, the key figure in the union discussions and who had been employed by the Company for more than one year and recipient of two promotions during his employment, was fired

---

**2.** In reaching its conclusion that the Company's anti-union animus was a motivating factor in its discharge of the three employees, the ALJ relied on anti-union sentiment expressed by operations manager Ted Salyers five months before the discharge. The ALJ credited the testimony of Jacobs that Salyers had stated he would run any union representative out, and that Sharpe had threatened to close the facility in the face of unionization.

We acknowledge the Company's attack on this reliance upon two isolated statements made

months before the discharge. The ALJ could, however, view those statements as one element of evidence supporting the General Counsel's case. The ALJ concluded:

> General Counsel has established the existence of union activity, Respondent knowledge, Respondent hostility, and precipitous adverse action hard on the heels of significant union activity. This is sufficient to establish a prima facie showing that the separations were discriminatorily motivated.

for misappropriation of funds, unsatisfactory dress, "mouthing off," poor judgment, and declining work performance. The allegation that Jacobs misappropriated funds proved to be highly questionable, Sharpe conceding that this was not the basis for Jacobs' discharge. An interoffice memo circulated after Jacobs was fired stated that he was discharged for dress and attitude problems including low production output. As to the dress and attitude problems, the ALJ found that no creditable evidence in the record supported these "bare conclusions."

The Company also relied on Jacobs' alleged poor performance as supervisor of the short-lived second shift and on two projects prior to the discharge. The record shows (and the Company's president admitted), however, that much of Jacobs' difficulty as supervisor of the second shift resulted from defective products, over which Jacobs had no control. Furthermore, the Company did not reprimand Jacobs for his performance as a supervisor and in fact expanded his duties when the second shift was terminated and Jacobs retained his prior position. Despite the Company's claims that Jacobs' work deteriorated during the month prior to the discharge, the credited testimony shows that no one warned Jacobs that the quality of his work had diminished or that his productivity level was poor. In light of the questionable reasons given by the Company for termination, and its failure to show that it would have discharged Jacobs absent his union activity, we conclude that the NLRB's conclusion that Jacobs' discharge was pretextual is supported by substantial evidence.

The Company's basis for discharging Mark Cox is no more persuasive. Cox was hired by the Company in September 1983 for assembling, but he primarily performed shearing and breaking work. The Company claims that Cox was placed on "indefinite layoff" because he "indicated a desire to perform only the shearing and breaking functions and the level of production in the shop could not justify the use of a full-time person in that position."

Cox, on the other hand, credibly and without contradiction testified that he never refused to do other work or stated that he would only do shear and break work. Other testimony showed that Cox did perform other work upon request. Cox testified that although his primary job was shearing and breaking, he did other work once or twice a week as needed and instructed by supervisor Erwin. Both Salyers and Erwin confirmed this testimony. Indeed, Salyers not only acknowledged that Cox would and did do other work, but further admitted that he did not believe that Cox only wanted to do shear and break work.

Furthermore, it is uncontroverted that Cox never received any complaints or warnings, written or oral, about any aspect of his work. On October 13, however, three weeks before termination, Sharpe gave Cox a two-step, 30-cent pay raise and a $50.00 bonus, and told Cox that he liked the way he was working. The Company's claim that it discharged Cox because of his work performance is further weakened by the fact that at the time of the discharge the Company did not express dissatisfaction with Cox's work. When Cox was "laid off," the uncontroverted evidence shows that Salyers told Cox that his work was good, but that he was being "laid off" because the Company was transferring work to another company. Substantial evidence thus supports the Board's finding that Cox was discharged unlawfully for his participation in protected activity.

Even though the Company committed an unfair labor practice in discharging Jacobs and Cox, we do not find that substantial evidence supports the NLRB's finding that the discharge of Fox was pretextual. Fox was also hired as a general laborer in September, 1983, but, unlike Cox, Fox was placed on a ninety-day probationary period. Fox testified that he was aware of his status and knew that if he performed unsatisfactorily during that time period he would be fired. The Board found that Fox had performed poorly during the probationary period. Despite recognizing the Com-

pany's legitimate basis to discharge Fox, the ALJ concluded that the discharge was unlawful, conceding that "the matter is not entirely free from doubt."

In reaching this conclusion, the Board relied heavily upon what it considered to be a pretextual claim that the Company discharged Fox in part for a poor welding job on the morning he was terminated, since the Board found at the same time that the Company had already decided to fire Fox the previous evening. The ALJ and the Board failed to take into account that the Company merely recited all examples of Fox's poor workmanship, including an unsatisfactory job after the decision had been made. In light of Fox's status as a probationary employee and his clearly continuing unsatisfactory work performance during that period, it is our view that the Company satisfied its burden of demonstrating that Fox would have been fired even if union activities had not been present. Accordingly, we reverse the Board's determination as to Fox, finding that it is not supported by substantial evidence.

We enforce the NLRB's decision pertaining to Jon Jacobs and Mark Cox, but we deny enforcement of that portion of the Board's order relating to Robert Fox.

MERRITT, Circuit Judge, dissenting in part.

I would enforce the Board's order as to Fox as well as Jacobs and Cox. The record supports the Board's view that the same anti-union animus that led to the firing of the other two also led the company to fire Fox. Fox had received a raise for his work shortly before being fired. The decision to fire him and the others was made suddenly in mid-week. The faulty welding work on which the company expressly relied occurred the day after the decision to fire him was made. There was evidence of a substantial nature from which the Board could find that all three firings were prompted by anti-union views and that the reasons asserted were pretextual.

* This opinion was originally issued in typewritten form because of the need to decide this case