**DAYTON TYPOGRAPHIC SERVICE, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 85–5099, 85–5228.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 22, 1985.

Decided Dec. 13, 1985.

Walter Reynolds, argued, Chester E. Finn, Porter, Wright, Morris and Arthur, William Eric Minamyer, Dayton, Ohio, for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Frances H. O'Connell,

Helen Morgan, argued, Washington, D.C., for respondent.

Before KEITH, KENNEDY and KRU-PANSKY, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Petitioner, Dayton Typographic Service, Inc. ("the Company"), seeks review of a decision of the National Labor Relations Board ("NLRB"), reported at 273 N.L.R.B. No. 151, 118 L.R.R.M. 1232 (1984), adopting the recommended order of the Administrative Law Judge ("ALJ") finding that the Company committed two separate unfair labor practices by discharging employee Jack A. Hoendorf for engaging in protected concerted activities and by interrogating another employee, Paul Fugate, without observing necessary safeguards, and asking Fugate for a copy of the affidavit Fugate had given to the NLRB.

On January 19, 1981, the Company laid off Hoendorf. Before the layoff, Hoendorf worked in the Company's customer service department. During the relevant period, the Company employed Hoendorf, Fugate, and George Long as full-time customer service department employees. Wava Runck also worked in the department as a part-time employee. William Southam supervised the department until January 1981, when the Company promoted him. After Southam's promotion, the Company hired Paul Logan, a former employee, to replace Southam.

During a November 1980 meeting, Curtis Couch, the composing room foreman, made a derogatory remark about the customer service department's work. After the meeting, the four customer service department employees met with each other and discussed the problems they were experiencing in their jobs. At Fugate's suggestion, the employees decided to present their grievances to the Company.

About a week later the four employees met with Southam. The employees complained about three things: (1) Couch's demeaning treatment, (2) overtime work on Saturdays without additional pay or compensatory time off, and (3) their crowded, outmoded office area. Although Southam told the employees that he would see what he could do about Couch and the office area, Southam indicated that not enough Saturdays were involved to justify additional pay or compensatory time off. After the meeting, Couch's conduct toward the customer service department employees improved dramatically, and the Company upgraded the office area. The Company, however, did not address the employees' concern about uncompensated Saturday time.

After the Company promoted Southam in December 1980, but before Paul Logan returned to work for the Company, Logan met Hoendorf for breakfast to discuss potential problems in the customer service department. Hoendorf raised the subject of unpaid Saturday overtime work and asked how Logan planned to handle the problem. Logan responded that he was not going to work every Saturday, as Southam had done, but that he needed time to analyze the situation. During this meeting, Logan told Hoendorf that he would be out of the department working with a new salesman and that he wanted Hoendorf to run the department during those absences. Hoendorf declined the request.

One day in early January 1981, Hoendorf asked Logan, in the customer service department in front of George Long, what Logan was going to do about the upcoming Saturday. Logan indicated that he had not made a decision. When Hoendorf pressed for an answer, Hogan told Hoendorf not to make such a fuss and advised Hoendorf that Hoendorf should have raised the subject privately rather than bringing the matter up in front of Long. Hoendorf stated firmly that he would not work overtime on Saturday unless the Company compensated him for working. Logan declined to discuss the matter further and returned to his office.

Later in January, Logan told Hoendorf and Fugate that one of them was going to have to work that Saturday. Hoendorf and

Fugate both stated that they did not want to work unless the Company would compensate them in some way. Logan declared that they had no choice and the Company would not pay them. As the discussion between Hoendorf, Fugate, and Logan continued, Logan's tone became increasingly loud and angry, but Hoendorf continued to press the view that the Company should compensate those who work Saturdays.

On January 19, 1981, William Taylor, the Company's president, called Hoendorf into his office and announced that business was slow and that the Company had selected Hoendorf for layoff. When Hoendorf asked Taylor why the Company had selected him, Taylor cited Hoendorf's bad attitude and "this stink that you've been putting up about working Saturdays." When Hoendorf asked Taylor to explain, Taylor indicated that Hoendorf had confronted Logan in the customer service department in front of other people about the unpaid Saturday overtime work. Taylor told Hoendorf that Hoendorf had handled the confrontation the wrong way by bringing it up in front of everyone in the department.

Shortly after laying off Hoendorf, the Company hired two new employees, Herman Rose and Debbie Rife. Although the Company hired Rose as a librarian and Rife as an experiment, both worked at various times in the customer service department because the department was shorthanded.

On April 29, 1982, the Thursday preceeding the administrative hearing, the Company's attorney, Chester E. Finn, interviewed Fugate in the Company's conference room. Finn informed Fugate that he was representing the Company in Hoendorf's case and was preparing for trial. Finn asked if representatives of the NLRB had interviewed Fugate. Fugate told Finn that he had given the NLRB a written statement. Finn asked Fugate if Fugate would be willing to provide Finn with a copy of that statement. Fugate testified at the administrative hearing that the following exchange occurred:

> I asked you if it was legal. You said, "Sure." I said, "[W]ell, is it also legal if the NLRB wants a copy of the statement I gave to the company?"
>
> And you said, "Sure, there's nothing wrong with that."

Although Fugate did not have a copy of the affidavit with him, he agreed to bring the affidavit to the office so that Finn could have a copy of it. On May 4, 1982, Finn again went to the Company's plant. After Logan called Fugate, Fugate took a copy of the affidavit to the office and gave Finn a copy of his copy of the affidavit. Fugate testified that he was willing to give Finn a copy of his affidavit. When asked if Finn made any threats to him as to anything that might happen to him if he did not give a copy of his statement to Finn, Fugate replied, "Absolutely not."

The company raises three issues in this appeal: (1) Whether substantial evidence supports the NLRB's finding that employee Jack A. Hoendorf was engaged in protected concerted activity prior to his discharge; (2) If so, whether substantial evidence supports the NLRB's finding that the Company committed a 29 U.S.C. § 158(a)(1) unfair labor practice by terminating Hoendorf's employment; and (3) Whether substantial evidence supports the NLRB's finding that the Company violated 29 U.S.C. § 158(a)(1) by interrogating employee Paul Fugate and by requesting a copy of the affidavit which he had given to the NLRB. For the reasons stated below, we enforce the NLRB's order as to Hoendorf but deny enforcement of the portion of the NLRB order regarding the interrogation of Fugate.

### I.

Title 29 U.S.C. § 157 gives employees "the right ... to engage in ... concerted activities for the purpose of ... mutual aid or protection...." Accordingly, § 157 protects concerted action by employees to present complaints about working conditions to management. *NLRB v. Washington Aluminum Co.*, 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 298 (1962). An

individual employee's presentation of complaints to management can qualify as "concerted activity." *See, e.g., Ajax Paving Industries, Inc. v. NLRB*, 713 F.2d 1214, 1217 (6th Cir.1983). In *ARO, Inc. v. NLRB*, 596 F.2d 713, 718 (6th Cir.1979), this Court stated:

> For an individual claim or complaint to amount to concerted action under the Act it must not have been made solely on behalf of an individual employee, but it must be made on behalf of other employees. . . .

The NLRB has recognized that an employee may not claim the protection of 29 U.S.C. § 157 if the employer discharges the employee following a personal "gripe" about working conditions. *See, e.g., Capitol Ornamental Concrete Specialities, Inc.*, 248 N.L.R.B. No. 109, 103 L.R.R.M. 1518 (1980). In *NLRB v. City Disposal Systems, Inc.*, 465 U.S. 822, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984), the Supreme Court reaffirmed that the NLRB's determination whether employees engaged in concerted activity "implicates its expertise in labor relations." Consequently, "a reasonable construction by the Board is entitled to considerable deference." *Id.* Accordingly, this Court faces the question whether the NLRB made a reasonable determination that Hoendorf was engaged in concerted activity.

29 U.S.C. § 157 gives employees the right to engage in concerted activity; 29 U.S.C. § 158(a)(1) implements the right by making an employer's interference with the right an "unfair labor practice." In *Ajax Paving Industries, Inc. v. NLRB, supra* at 1216, this Court stated that:

> To establish a violation of [29 U.S.C. § 158(a)(1)] the Board must demonstrate that the employee was engaged in such protected concerted activity, that the employer knew of the activity and its concerted nature, and that the employee's protected activity was a motivating factor prompting some adverse action by the employer.

Consequently, the NLRB had to find that Hoendorf was engaged in protected concerted activity, that the Company knew of the activity and its concerted nature, and that the protected activity was a motivating factor in the decision to lay off Hoendorf.

Under 29 U.S.C. § 160(e), "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." The Supreme Court has defined substantial evidence as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). Accordingly, we must affirm the NLRB's decision if substantial evidence on the record as a whole supports the NLRB's findings even if this panel "would justifiably have made a different choice had the matter been before it de novo." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). *Accord NLRB v. Brown*, 546 F.2d 690, 691–92 (6th Cir.1976).

■ The Company contends that the NLRB incorrectly inferred that the December 1980 and January 1981 incidents involving Hoendorf served as a continuation of the joint complaints that the customer service department employees made at the November 1980 meeting. In *NLRB v. Guernsey-Muskingum Electric Co-operative, Inc.*, 285 F.2d 8, 12 (6th Cir.1960), this Court stated:

> It is sufficient to constitute concert of action if from all of the facts and circumstances in the case a reasonable inference can be drawn that the men involved considered that they had a grievance and decided, among themselves, that they would take it up with management.

Considering all the circumstances, we hold that the NLRB reasonably could have concluded that Hoendorf's December and January complaints about unpaid overtime were a continuation of the concerted activity that began in November 1980 when the customer service department employees

agreed to present their complaints to the Company.

The Company contends that Hoendorf was presenting a "personal gripe" when he complained about unpaid Saturday overtime work in December 1980 and January 1981. The Company, however, admits that the four customer service employees met with Southam in November 1980 to present their complaints about Couch's demeaning treatment, uncompensated Saturday overtime, and office space. Although Couch's attitude apparently improved after the meeting and the Company improved office conditions, the ALJ found that the Company had not resolved the employees' complaint on the issue of uncompensated Saturday work. After the November 1980 meeting between the customer service department employees and Southam, Hoendorf, both individually and in the presence of fellow employees, continued to press for a satisfactory resolution of the uncompensated Saturday work issue. Although the other employees did not formally authorize Hoendorf to speak on their behalf, this Court has stated that "[t]he fact that the employees do not formally choose a spokesman ... does not negate concert of action." *Jim Causley Pontiac v. NLRB*, 620 F.2d 122, 124 (6th Cir.1980).

The Company contends that after Southam told the employees at the November 1980 meeting that the Company would not compensate them for working Saturdays unless it asked them to work regularly on Saturdays, Hoendorf's fellow employees were no longer interested in the Saturday work issue. The Company, however, did not present any evidence showing that Hoendorf's fellow employees were no longer interested in the Saturday work issue. Fugate testified that Southam did not resolve the Saturday work issue at the November 1980 meeting and did not mention the issue after the meeting. Hoendorf obviously felt that the Company had not resolved the issue. Long's testimony indicates that he thought Southam was still considering the matter. Although the Company contends that the NLRB's opinion improperly shifted the burden of proof

on this issue to the Company by requiring the Company to present evidence that the other employees were no longer interested in the Saturday work issue, we disagree. The NLRB could have reasonably concluded that the service department employees were still interested in the Saturday work issue at the time of Hoendorf's confrontations with Logan in January 1981.

The Company also argues that since the Company did not actually require any employee to work on Saturday, Hoendorf's complaints never presented an actual issue. The Company, however, overlooks the fact that in early January 1981, Logan told Hoendorf and Fugate that one of them would have to work that Saturday. Hoendorf's complaints were more than hypothetical "gripes." Accordingly, substantial evidence supports the NLRB's finding that Hoendorf's December 1980 and January 1981 complaints concerning Saturday work arose out of and continued the employees' November 1980 concerted activity.

## II.

■ The Company contends that a business slowdown and Hoendorf's poor attitude toward work and his co-workers caused his layoff. In *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983), the Supreme Court stated that an employer commits an unfair labor practice by discharging an employee for engaging in 29 U.S.C. § 157 concerted activities if the employer "has no other basis for the discharge, or if the reasons that [the employer] proffers are pretextual." Once the Company asserted that it laid off Hoendorf for legitimate reasons, the NLRB had the burden to "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Borel Restaurant Corp. v. NLRB*, 676 F.2d 190, 193 (6th Cir.1982). Since an employer rarely admits that it discharged an employee for engaging in protected concerted activities, the NLRB may rely on circumstantial evidence in determining an employer's actual mo-

tive. *NLRB v. E.I. DuPont De Nemours,* 750 F.2d 524, 529 (6th Cir.1984). Accordingly, the NLRB may infer unlawful intent from the circumstances surrounding a discharge. *NLRB v. G & S Metal Products Company, Inc.,* 489 F.2d 441, 443 (6th Cir. 1973). The NLRB satisfied its burden in this case. Once the NLRB has established a prima facie case, the Company had to rebut the prima facie case by showing that the Company would have discharged Hoendorf absent the protected activity. *NLRB v. Transportation Management Corp.,* 462 U.S. at 401, 103 S.Ct. at 2474. *See also NLRB v. Baja's Place,* 733 F.2d 416, 421 (6th Cir.1984). We hold that substantial evidence also supports the NLRB's finding that the Company discharged Hoendorf for engaging in protected concerted activity.

The Company claims it laid off Hoendorf because he had a bad attitude toward work and co-workers. The Company cites two examples of incidents in May or June 1980 and October or November 1980 where Hoendorf displayed a bad attitude toward work. Both of these incidents, however, occurred considerably before the Company discharged Hoendorf and the Company did not warn Hoendorf or discipline him for these incidents.

Finally, the Company claims that a slowdown in business required it to discharge Hoendorf. Tom Alexander, head of the sales-service department, admitted, however, that shortly after laying off Hoendorf the Company placed advertisements in the Cincinnati and Dayton newspapers for additional service representatives. The Company, in fact, hired two new employees and trained them to work, at least part-time, in the customer service department. Alexander testified that although the Company hired Herman Rose to fill the new position of librarian, the Company did give Rose "a little bit of training in the service department so that he could help out in emergency situations." Alexander also admitted that Debbie Rife did some service representative work but stated the Company was "trying an experiment." Although seasonal fluctuations affected the Compa-

ny's customer service department and the Company had laid off an employee, Jay Nelson, several years prior to the incident involved in this case, the Company normally did not lay off employees. In light of these circumstances, substantial evidence supports the NLRB's conclusion that the Company discharged Hoendorf for engaging in concerted activity.

In the December 1980 meeting, Logan asked Hoendorf to take charge of the customer service department in Logan's absence. Nevertheless, the Company abruptly discharged Hoendorf about a month later. The close timing between the discharge of a valued employee and protected activity supports the NLRB's finding that the Company was unlawfully motivated by that activity to discharge him. *Cf. NLRB v. E.I. DuPont De Nemours, supra* at 529; *Coil-A.C.C., Inc. v. NLRB,* 712 F.2d 1074, 1076–77 (6th Cir.1983). William Taylor's statement that the Company was discharging Hoendorf because he had a bad attitude and created friction by pressing for resolution of the problem in front of a fellow employee supports the inference that the Company discharged Hoendorf for engaging in concerted activities. Accordingly, substantial evidence supports the NLRB's finding that the Company laid off Hoendorf because of his protected concerted activities.

### III.

The Company argues that, under the circumstances of this case, it did not commit an unfair labor practice by questioning Fugate and obtaining from him a copy of the affidavit he had previously given to the NLRB. This Circuit has long recognized that an employer has a privilege to interview employees for the purpose of discovering facts relevant to the issues raised in an unfair labor practice complaint. *See, e.g., Anserphone, Inc. v. NLRB,* 632 F.2d 4, 6 (6th Cir.1980); *Surprenant Manufacturing Co. v. NLRB,* 341 F.2d 756, 762 (6th Cir.1965); *NLRB v. Winn-Dixie Stores, Inc.,* 341 F.2d 750, 753 (6th Cir.), *cert.*

*denied,* 382 U.S. 830, 86 S.Ct. 69, 15 L.Ed.2d 74 (1965).

In *Anserphone, Inc. v. NLRB, supra* at 6, this Court refused to enforce the portion of the NLRB's order finding that the company had coercively interrogated employees and asked an employee for a copy of the affidavit she gave to a NLRB agent. The Court wrote:

> We cannot find evidence to support the conclusion that the interviewing of a few employees by Anserphone's representatives prior to an unfair labor practice hearing constituted coercive interrogation.... It is well-settled that an employer is privileged to interview employees for the purpose of discovering facts relevant to issues raised in an unfair labor practice case to aid in preparation of the case. *Surprenant Mfg. Co. v. N.L.R.B.,* 341 F.2d 756, 762 (6th Cir. 1965). Further, there is no evidence in the record to indicate that the employee who furnished the company representative with a copy of the affidavit she submitted to the Board did so out of any fear, rather it appears she did it in the spirit of cooperation.

In this case, when the Company's counsel asked Fugate whether the Company made any threats to pressure him to give the Company a copy of his statement, Fugate responded, "Absolutely not." Nevertheless, the ALJ concluded that the attorney's interrogation of Fugate and the attorney's request for a copy of the affidavit violated 29 U.S.C. § 158(a)(1). In a footnote, the ALJ noted:

> Respondent in its brief relies mainly on the case of *Anserphone, Incorporated, v. N.L.R.B.,* 632 F.2d 4 (6 Cir., 1980) [sic]. When this case was before the Board, the Board found that the Company had not observed the safeguards set forth in *Johnny's Poultry supra,* [sic] when that employer had interrogated an employee, and asked an employee for a copy of the affidavit she had given to a Board agent. The Board thereupon found that the Company had violated the Act. On appeal, the Sixth Circuit did not find the

Employer's conduct to be violative of the Act, and refused the enforcement of this portion of the Board's decision. As previously stated Administrative Law Judges are bound by decisions of the Board, until the Supreme Court reverses it.

Consequently, the ALJ apparently refused to follow Sixth Circuit precedent. The NLRB attempted to distinguish *Anserphone* on the rather questionable ground that in *Anserphone,* this Court relied on affirmative evidence to show that no fear of reprisal accompanied the interrogation or the request for the employee's affidavit. The NLRB observed that the *Anserphone* court cited one employee's refusal to give the company an interview and the fact that another employee gave the company a copy of her affidavit in a spirit of cooperation rather than out of fear. The NLRB reasoned that since Fugate asked the Company's attorney if he could legally give the Company a copy of the affidavit he gave to the Board, Fugate did not provide the affidavit in the spirit of cooperation. The NLRB, however, ignores Fugate's testimony that he was willing to give the Company's lawyer a copy of his affidavit. Furthermore, when asked if the Company's lawyer made any threats as to anything that might happen to him if Fugate did not give the Company's lawyer a copy of his affidavit, Fugate replied, "Absolutely not."

■■ In *Rossmore House,* 269 N.L.R.B. No. 198, 116 L.R.R.M. 1025, 1026 (1984) *enforced sub nom. Hotel Employees & Restaurant Employees Union, Local 11 v. NLRB,* 760 F.2d 1006 (9th Cir.1985), the Board stated that the basic test for evaluating the legality of an interrogation is "whether under all of the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." When assessing the coercive tendency of an interrogation, the NLRB looks at, among other things, the background, the nature of the information sought, the questioner's identity, and the place and method of interrogation. *Id.* at 1027 n. 20. *Accord NLRB v. Arm-*

strong *Circuit, Inc.*, 462 F.2d 355, 357 (6th Cir.1972). In evaluating the coercive tendency of questioning employees for the special purpose of preparing the employer's defense to an unfair labor practice complaint, the NLRB considers, among other things, whether the employer has communicated to the employee the purpose of the questioning, given assurances that no reprisal will take place, and obtained voluntary participation. *Johnnie's Poultry Co.*, 146 N.L.R.B. No. 98, 55 L.R.R.M. 1403, 1406 (1964), *enforcement denied on other grounds*, 344 F.2d 617, 619 (8th Cir.1965). *Accord Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 456 (6th Cir.1967). The NLRB also considers whether the employer seeks information outside the issues raised in the complaint by, for example, asking the employee for a copy of the affidavit the employee gave the NLRB during its investigation of an unfair labor practice charge relating to union recognition because affidavits "necessarily reveal the employees' attitudes, activities, and sympathies.... [and] the union sympathies and activities of other employees" and potentially cover matters outside the scope of a complaint. *NLRB v. Winn-Dixie Stores, Inc., supra* at 752–53.

Although the Company admits that its attorney did not give the warnings that the NLRB recognizes as minimizing the coercive tendency of an interrogation, the ALJ, at least implicitly, found that Fugate wanted to cooperate. Furthermore, the record does not contain any evidence of union activities which would increase the possibility that the affidavit would cover matters outside the complaint or reveal the employee's "attitudes, activities, and sympathies." As in *Anserphone, supra* at 6, "there is no evidence in the record to indicate that the employee who furnished the [C]ompany representative with a copy of the affidavit [he] submitted to the Board did so out of any fear, rather it appears [he] did it in the spirit of cooperation." Under the facts and circumstances of this case, we deny enforcement of this portion of the NLRB's order.

Accordingly, we enforce the portion of the NLRB's decision ordering reinstatement of Jack Hoendorf but deny enforcement of that portion of the NLRB decision regarding the interrogation of Paul Fugate and the accompanying request for a copy of the affidavit that Fugate gave the NLRB.