816 F.2d 678
 141 L.R.R.M. (BNA) 2984
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
AMERICAN MODEL AND PATTERN, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers of America, Intervenor.
 Nos. 85-6060, 86-5049.
 United States Court of Appeals, Sixth Circuit.
 April 17, 1987.
 
 Before RYAN and BOGGS, Circuit Judges, and BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner American Model & Pattern, Inc. (the Company) petitions for review of an order of respondent National Labor Relations Board (the Board) holding that the Company committed several unfair labor practices in violation of section 8 of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158.[1] The Company contends that several of the Board's factual findings are not supported by substantial evidence. We disagree and therefore affirm the Board's order in its entirety.
 
 
 2
 The Company operates a shop in St. Clair Shores, Michigan, which produces plastic injection molds, and a plant in Mt. Clements, Michigan, which manufactures goods using those molds. The St. Clair Shores facility includes both a wood shop and a metal shop. This case concerns only the metal shop employees at the St. Clair Shores facility.
 
 
 3
 On December 9, 1981, the St. Clair Shores metal shop employees elected intervenor International Union of Automobile, Aerospace, and Agricultural Implement Workers of America (the Union) as their statutory collective bargaining representative. That election spawned a Board proceeding, American Model & Pattern, Inc., 269 N.L.R. B No. 309 (March 21, 1984), in which the Board found, after a hearing conducted in November 1982 during which employees Paul Harrington and Nelson Bewley testified, that the Company had engaged in several unfair labor practices, including laying off Harrington one day after the election because he had led the Union's organizing campaign.[2] That finding rested partially on the Board's factual conclusion that the Company normally based its layoff decisions on seniority. The Board ordered, inter alia, Harrington's reinstatement with back pay.
 
 
 4
 Three months after the election, on March 25, 1982, the Union was certified. Ten weeks thereafter, on June 7, 1982, the Company and the Union began what ultimately became a twenty-month process of fruitless collective bargaining that ended on February 7, 1984. During that process, in early 1983, the following events occurred out of which this dispute arises.
 
 
 5
 In January 1983, in the midst of the aforementioned negotiations, the Company informed the Union of its decisions to lay off five employees and to discontinue the practice of making annual contributions in December to employees' Individual Retirement Accounts (IRA's). Several months later, in April, the Company rejected a wage increase proposed by the Union and instead proposed a wage reduction. In response, the Union requested that the Company provide financial information to substantiate the necessity of the Company's bargaining position. The Company never complied with that request. Those three actions, among others,[3] triggered the consolidated complaint filed by the Union with the Board that is the focus of our review.
 
 
 6
 The consolidated complaint alleged, in pertinent part, that the Company violated sections 8(a)(5) and (1)[4] of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), by (1) laying off five employees without giving the Union sufficient notice of and a meaningful opportunity to bargain over the manner in which employees were to be selected for layoff; (2) unilaterally discontinuing its practice of making annual IRA contributions to employees without first bargaining to impasse over the change; and (3) failing to comply with the Union's request for financial information. The complaint also alleged that the Company violated sections 8(a)(3),[5] 29 U.S.C. Sec. 158(a)(3), and 8(a)(4),[6] 29 U.S.C. Sec. 158(a)(4), respectively, by laying off three employees (Harrington, Devereaux and Bewley) because of their union activities, and by laying off two employees (Harrington and Bewley) because of their participation in the prior Board proceeding against the Company.
 
 
 7
 After a hearing, the Administrative Law Judge (ALJ) found against the Company on all the issues. In doing so, the ALJ noted:
 
 
 8
 The facts found in this case, read together with the Board's decision in [the prior proceeding against the Company], present a case study in the frustration of the purposes and policies of the Act by an employer who continues to go about its business needless of the rights of its employees and their collective bargaining representative, and who, in so doing, has rendered virtually meaningless a certification which was issued nearly three years ago and a statute which was enacted nearly fifty years ago.
 
 
 9
 American Model and Pattern, Inc., 277 N.L.R.B. No. 18, slip op. at 20 (Oct. 31, 1985) (hereinafter "slip op."). The Board adopted the ALJ's decision and ordered the Company to cease and desist from the violations found, to bargain with the Union upon request, to furnish the financial data requested, to reinstitute its practices of making annual IRA contributions and of observing seniority in layoffs until it has bargained in good faith to impasse or agreement concerning those practices, to reinstate and make whole the unlawfully laid off employees, to make whole all employees who suffered due to the unlawful discontinuance of IRA contributions, and to post an appropriate notice.
 
 I Standard of Review
 
 10
 The Board's findings of fact and applications of law to the particular facts are conclusive if supported by substantial evidence. 29 U.S.C. Sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474 (1951); Dayton Typographic Service, Inc. v. NLRB, 778 F.2d 1188, 1191 (6th Cir.1985). Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); Dayton Typographic Service, 778 F.2d at 1191. Accordingly, we must affirm the Board's decision if substantial evidence on the record as a whole supports the Board's factual findings, even if we would justifiably have made a different choice had the matter been before us de novo. Universal Camera Corp., 340 U.S. at 488; Dayton Typographic Service, 778 F.2d at 1191.
 
 II Layoff Notification and Criteria
 
 11
 According to the testimony of James Sawyer, the Union's chief negotiator, on Friday, January 7, 1983, the Company's attorney and chief negotiator, David Gunsberg, telephoned Sawyer and, "as a courtesy," informed him that the Company was laying off four employees that afternoon due to the lack of work. Gunsberg told Sawyer that he did not know exactly which four employees were targeted for layoff. On the following Monday, January 10, just prior to a bargaining session, Sawyer learned the names of those laid off and that five, not four, employees had been involved.
 
 
 12
 According to Gunsberg's testimony, however, the aforementioned telephone conversation occurred on January 6, not on January 7, and Gunsberg informed Sawyer of the correct number of employees selected for layoff and their names. Gunsberg testified, moreover, that Sawyer stated he had no problem with the layoffs and did not wish to negotiate about them.
 
 
 13
 The testimony is essentially consistent concerning what transpired during the bargaining session between Sawyer and Gunsberg the following Monday, January 10. The parties discussed the layoffs in detail. The Company conceded that seniority had played no part in its selection of employees for layoff; the Union admitted that the lack of work was a legitimate justification for layoffs. Thus, the bone of contention at the meeting was whether seniority should have played the primary role in the Company's selection of particular employees for layoff. The Company ultimately refused to reconsider its layoff selections.
 
 
 14
 In its complaint to the Board, the Union alleged that the foregoing events constitute a violation of sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), because the Company implemented the layoffs without giving the Union sufficient notice of and a meaningful opportunity to bargain over the Company's decision to depart from its previous practice of basing layoff decisions on seniority. The ALJ agreed:
 
 
 15
 The obligation [to bargain to impasse in good faith] includes something more than presenting the union with a fait accompli and asking for clearance concerning something that has already taken place....
 
 
 16
 In this case, the [Company] had already determined that a layoff would take place when Gunsberg called Sawyer on January 7 to relay the information. It had also decided who was going to be eliminated. The overture by Gunsberg was not only after the fact, but was also attended by incorrect information concerning the Company decision [the number and names of the employees to be laid off] which would hamper intelligent and meaningful bargaining. However, of paramount importance is that Gunsberg's phone call to Sawyer was described by Gunsberg to Sawyer as merely a "courtesy"....
 
 
 17
 The duty to bargain in good faith is not a courtesy.
 
 
 18
 Slip op. at 14.
 
 
 19
 Here, the Company concedes that, under sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), "[t]he duty to bargain in good faith over a layoff includes the duty to notify the Union of the layoff and [to] bargain with the Union regarding both the criteria for selection and the application of such criteria to the particular employees." Company's Br. at 15-16. The Company maintains, however, that the Board's decision that the Company failed to fulfill its duty lacks substantial evidentiary support because (1) Sawyer's testimony concerning the content of the January 7 phone call between Gunsberg and Sawyer is incredible, and (2) the parties did, in fact, bargain to impasse over the seniority issue during the January 10 negotiating session.
 
 
 20
 In support of its contention that Sawyer's testimony concerning the phone call does not constitute substantial evidence on which to base a conclusion that the Company failed to provide adequate notice of its layoff decision, the Company proffers only two inter-office communications. The first tends to indicate only that Gunsberg knew before January 6 the names of the employees to be laid off; the second tends to corroborate only Gunsberg's belief that he informed Sawyer of those names on January 6. Neither conclusively indicates, however, that Gunsberg did, in fact, tell Sawyer on January 6 the correct names and number of employees to be laid off. Consequently, neither provides a sufficient basis to disturb the ALJ's determination to credit Sawyer's credibility over Gunsberg's, a determination entitled to substantial deference on appeal:
 
 
 21
 The standard for review for the Board's determinations of credibility is narrow. Because the Administrative Law Judge and the Board are the triers of fact in the first instance, their credibility resolutions are to be accorded considerable weight on review. The Board's choice between conflicting testimony will not be set aside simply because this court "would justifiably have made a different choice had the matter before it been de novo." We will set aside the Board's determination of credibility only where its resolution is unreasonable.
 
 
 22
 Local Union No. 948, International Brotherhood of Electrical Workers v. NLRB, 697 F.2d 113, 117 (6th Cir.1982) (citations omitted) (emphasis added), quoting Universal Camera Corp., 340 U.S. at 488. The Company has presented nothing which convincingly demonstrates that the ALJ's acceptance of Sawyer's clear and unwavering version of the January 7 phone call is "unreasonable." Therefore, the Board's conclusion that the Company failed to provide to the Union meaningful notice of its layoff decisions is supported by substantial evidence.
 
 
 23
 In support of its contention that the Board's finding that the Company presented the Union with a fait accompli lacks substantial evidentiary support,[7] the Company points to the facts that the seniority issue had long been disputed prior to January 1983 and that the parties discussed the seniority issue in detail during the January 10 meeting. According to the Company, those facts permit only one reasonable conclusion--the parties actually bargained to impasse over the seniority issue during the January 10 negotiating session itself.
 
 
 24
 The Company's view of the evidence is reasonable, but so, too, is the Board's. The record does not disclose that the seniority issue was an active topic of debate prior to January 1983. Moreover, the record does, in fact, reveal that the Company had made a firm selection of layoffs prior to the January 10 meeting. Therefore, substantial evidence supports the Board's factual conclusion that, on January 7, 1983, the Company unilaterally discontinued its practice of basing layoffs on seniority and, on January 10, 1983, only discussed reinstitution of that practice. Consequently, we affirm the Board's holding that the Company violated sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), by failing to give the Union sufficient notice of, and a meaningful opportunity to bargain over, the manner in which employees were to be selected for the January 1983 layoffs.
 
 III Discriminatory Layoffs
 
 25
 An employer violates sections 8(a)(3)[8] and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(3) and (1), if an employee's support of the union is a "motivating factor" in the employer's decision to take adverse action against that employee, unless the employer demonstrates, as an affirmative defense, that the adverse action would have taken place even in the absence of the employee's union activities. Turnbull Cone Baking Co. v. NLRB, 778 F.2d 292, 296 (6th Cir.1985), cert. denied, 106 S.Ct. 2277 (1986). Similarly, an employer violates sections 8(a)(4)[9] and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(4) and (1), if an employee's participation in a Board proceeding against the employer is a motivating factor in the employer's decision to take adverse action against the employee, unless the employer can show the aforementioned affirmative defense. See NLRB v. Transportation Management Corp., 462 U.S. 393 (1983).
 
 
 26
 The ALJ found that in January 1983 the Company violated sections 8(a)(3), (4) and (1) by laying off employees Harrington, Devereaux and Bewley because of their union support and their participation in the prior Board proceeding against the Company. The ALJ based its finding of illegal motive on five factors: (1) the Company's long-standing anti-union animus, as demonstrated by the factual findings made in the prior Board proceeding;[10] (2) the Company's knowledge of the employees' union activities, as evidenced by Harrington's membership on the bargaining committee, Devereaux's active participation in one bargaining session and in several union meetings, and Bewley's presence as a witness in the prior Board proceeding; (3) the Company's failure to follow its past practice of basing layoff decisions on seniority, as shown by the factual findings made in the prior Board proceeding; (4) the Company's failure to present consistent and convincing non-discriminatory criteria on which it based its January 1983 layoff decisions, as demonstrated by the testimony of several employees; and (5) the close proximity in time (two months) between the Board hearing at which Harrington and Bewley testified and the layoff decision.
 
 
 27
 This court has recently provided guidance for reviewing the Board's handling of a "motivating factor" inquiry:
 
 
 28
 The Board may rely on all the evidence, including direct admissions as well as circumstantial evidence, in determining actual motive. Circumstantial evidence alone may be sufficient. Anti-union motivation may reasonably be inferred from a variety of factors, such as a company's expressed hostility towards unionization together with knowledge of the employees' union activities, proximity in time between the employees' union activities and their discharges, the inconsistencies between the proffered reason and other actions of the employer, and disparate treatment of certain employees compared to other employees with similar work records or offenses.
 
 
 29
 Turnbull, 778 F.2d at 297 (citations omitted).
 
 
 30
 Applying the Turnbull guidelines to the facts here, the Board's finding clearly is supported by substantial evidence. First, the findings in the prior Board proceeding provide an ample evidentiary basis on which to conclude that the Company harbored an anti-union animus and customarily made its layoff decisions according to seniority. Second, the testimony plainly reveals that the Company was aware of the employees' support of the Union and of their participation in the prior Board proceeding. Third, the testimony concerning the absence of legitimate non-discriminatory bases for the January 1983 layoffs, though certainly not overwhelming, permits a reasonable conclusion that discriminatory criteria were applied. Therefore, the Board's conclusion that the Company's decision to lay off employees Harrington, Devereaux and Bewley in January 1983 violated sections 8(a)(3), (4) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(3), (4) and (1), is affirmed.
 
 IV IRA Contributions
 
 31
 In 1976 the Company terminated its pension plan and substituted a system of annual, year-end contributions to employee IRA accounts that it established in the National Bank of Detroit for each eligible employee.[11] Between 1976 and 1981, the Company carried out that policy annually without exception. The Company made the payments in December directly to the employees' IRA accounts and then in January notified each employee by certificate that a contribution had been made the month before to his account.
 
 
 32
 At the January 10, 1983 bargaining session, after the parties had concluded their discussion of the layoffs, Gunsberg announced that the Company had not made IRA contributions in December because the Company had experienced a bad year. No further discussion of the issue occurred that day, but the parties discussed it at subsequent bargaining sessions during the next several months. The Company never agreed to make IRA contributions for the 1982 calendar year.
 
 
 33
 As stated earlier, under sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), an employer may not change existing terms and conditions of employment without first bargaining to impasse with the union over the change. Peabody Coal Co. v. NLRB, 725 F.2d 357, 365 (6th Cir.1984); NLRB v. Allied Products Corp., 548 F.2d 644, 652 (6th Cir.1977). Whether a particular benefit is actually an existing term and condition of employment which gives rise to bargaining obligations is a question of fact for the Board.
 
 
 34
 The Union alleged in its complaint that the foregoing facts constitute a violation of sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), because the IRA contribution policy was a term of employment and the Company unilaterally altered it without first bargaining in good faith to impasse over the change. The ALJ agreed. In so doing, the ALJ discredited the Company's self-serving testimony that it personally informed every employee every year that the IRA contributions were "discretionary" payments on which the employees should not rely. The ALJ noted that, by 1982, the Company had made 57 IRA contributions--one to every eligible employee every year--and each payment amount derived from the same formula. The contributions had become, in the ALJ's view, "routine" and "regular as clock work." Slip op. at 16. The ALJ held, therefore, that the IRA contributions clearly constituted a term of employment, the alteration of which could not lawfully occur without first bargaining to impasse.
 
 
 35
 The ALJ then observed that, although the Company offered to bargain over the IRA issue during the spring of 1983, the Company had by then already altered its policy by not making the payments in December as it had done the previous several Decembers. Therefore, according to the ALJ, the Company had actually presented the Union with an unlawful fait accompli.
 
 
 36
 The Board's decision plainly is supported by substantial evidence. The patent regularity of the IRA contributions provides ample support for the conclusion that the contributions had become a term of employment. The undisputed fact that the Company failed to make IRA contributions in December 1982 indicates that the Company discontinued its policy unilaterally and later offered to bargain only over the reinstitution of the policy. This the Company may not do. Peabody Coal Co. v. NLRB, 725 F.2d at 365 ("An employer violates section 8(a)(5), when ... it makes unilateral changes in existing terms and conditions of employment without first notifying the collective bargaining agent."); NLRB v. Allied Products Corp., supra. The fact that under federal tax laws the Company could have made the contributions as late as April 15, 1983 does not alter the practical reality that the Company's failure to abide by its previous policy of making the contributions in December amounts to a unilateral modification of employment terms. Hence, we affirm the Board's holding that the Company's actions with respect to the IRA contributions violated sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1).
 
 V Request For Financial Information
 
 37
 During a negotiating session held on April 19, 1983, the Company rejected a wage increase proposed by the Union and instead proffered a proposal for a wage decrease. In response, the Union requested an opportunity to inspect the Company's financial records, including records pertaining to the Company's Mt. Clements plant, in order to analyze the necessity of a wage decrease. The Company never complied with that request.
 
 
 38
 The Union alleged in its complaint that the foregoing facts constitute a violation of sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1). Under those provisions, an employer claiming an inability to pay a proposed wage increase must provide the union with financial records sufficient to verify that claim. NLRB v. Truitt Manufacturing Co., 351 U.S. 149 (1956). As the Supreme Court has explained:
 
 
 39
 Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.
 
 
 40
 Id. at 152-53. The obligation to provide financial information arises, however, only if the employer claims an inability to pay, not merely an unwillingness to pay. Washington Materials, Inc. v. NLRB, 803 F.2d 1333 (4th Cir.1986); NLRB v. Harvstone Manufacturing Co., 785 F.2d 570 (7th Cir.), cert. denied, 107 S.Ct. 88 (1986). To determine how properly to characterize the employer's protestation, the Board must consider all the surrounding facts and circumstances, not just the precise words used. Harvstone Manufacturing Co., 785 F.2d at 574-77; New York Printing Pressmen v. NLRB, 538 F.2d 496 (2d Cir.1976). Refusing to agree to a proposed wage increase in order to "remain competitive" does not, standing alone, reflect a proclaimed inability to pay. Washington Materials, Inc., supra; Harvstone Manufacturing Co., supra.
 
 
 41
 Here, the ALJ determined that the Company had expressed an inability, not merely an unwillingness, to pay the proposed wage increase. The ALJ based this conclusion on the facts that (1) the Company had justified its refusal to make IRA contributions on the ground that it had experienced a bad year, and (2) the Company had claimed its rejection of the Union's wage proposal was necessary to remain competitive. The ALJ held, therefore, that the Company's refusal to provide financial records to the Union constituted an unfair labor practice. The Board agreed.
 
 
 42
 It is an extremely close question whether substantial evidence supports the Board's finding that the Company expressed an inability, not merely an unwillingness, to pay the proposed wage increase. After carefully reviewing the record as a whole, we conclude that such support does exist. According to the testimony of the Union's negotiators, the Company's negotiators claimed the January 1983 layoffs were necessary because in 1982 "business was getting tough"; and the discontinuance of IRA payments was necessary because in 1982 "cash flow was down", sales had dropped 50-55%, and losses amounted to approximately $300,000.[12] In justifying its refusal to accede to the Union's wage increase proposal, the Company again pointed repeatedly to the substantial financial losses that had occurred during 1982. Such heavy reliance on the Company's recently bleak financial performance to justify the Company's refusal to incur greater labor costs can reasonably be construed as essentially an implicit assertion that the Company simply could not afford those costs. Thus, although the Board could have credited the Company's insistent testimony that it never "pleaded poverty," the evidence also permitted the Board reasonably to conclude, as it did, that during the negotiations the Company proclaimed its inability, not merely its unwillingness, to accept the Union's wage proposal. Consequently, under sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), the Company was obliged to provide to the Union all the relevant financial information that the Union sought.
 
 
 43
 The Company further argues, however, that even if it had an obligation to provide relevant financial information, it had no obligation to provide financial information concerning its Mt. Clements plant because such information was irrelevant to the wage demands of the employees at its St. Clair Shores plant. The Board held otherwise.
 
 
 44
 This court has recently recognized that "[t]he Board's determination concerning whether information is relevant to the collective bargaining process is entitled to deference from the courts. The Board need only find a 'probability that the desired information [is] relevant ... and that it would be of use to the union in carrying out its statutory duties and responsibilities.' " E.I. DuPont de Nemours & Co. v. NLRB, 744 F.2d 536, 538 (6th Cir.1984), quoting NLRB v. Acme Industrial Co., 385 U.S. 432, 437 (1967).
 
 
 45
 Here, such a probability of relevance and utility is clearly evident. The Union's credible and uncontradicted expert testimony indicated that information concerning the Mt. Clements plant was necessary to assess the true financial status of the St. Clair Shores facility. The testimony explained that in an integrated operation like the Company's, the allocation of expenses between operating divisions is largely within management's discretion, and the St. Clair Shores facility could be made to appear unprofitable by allocating to it expenses that were properly attributable to the Mt. Clements plant. Thus, we affirm the Board's conclusion that, under sections 8(a)(5) and (1) of the NLRA, 29 U.S.C. Secs. 158(a)(5) and (1), the Company had an obligation to provide financial information to the Union and that that obligation encompassed the provision of financial information concerning its Mt. Clements plant.
 
 
 46
 For the reasons stated in this opinion, the Board's order is AFFIRMED and enforced in its entirety.
 
 
 
 [1]
 The Company petitions for review pursuant to section 10(f) of the NLRA, 29 U.S.C. Sec. 160(f). The Board cross-petitions for enforcement of its order pursuant to section 10(e) of the NLRA, 29 U.S.C. Sec. 160(e)
 
 
 [2]
 The Board also found that the Company violated section 8 of the NLRA during the organizing campaign which preceded the election by 1) coercively interrogating employees about their union sympathies; 2) granting wage increases to discourage union support; and 3) restricting non-working time in the plant to inhibit free discourse
 
 
 [3]
 The Union also alleged in its complaint to the Board that the Company unlawfully threatened to retaliate against unit employees for unfair labor practice charges filed by the Union on January 17, 1983, and unlawfully granted wage increases to five individual employees without first notifying and bargaining with the Union. The Board found against the Company on those allegations, to which findings the Company does not now object. Therefore, the Board's order with respect to those findings is affirmed. NLRB v. Valley Plaza, Inc., 715 F.2d 237, 240-41 (6th Cir.1983); NLRB v. M & B Contracting Corp., 653 F.2d 245, 246 (6th Cir.1981)
 
 
 [4]
 Section 8(a)(5) forbids an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. Sec. 158(a)(5). "To bargain collectively" is defined by section 8(d) as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder." 29 U.S.C. Sec. 158(d). Section 8(a)(1) forbids an employer "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed" by section 7. 29 U.S.C. Sec. 158(a)(1). The rights guaranteed by section 7 include the right of employees "to bargain collectively through representatives of their own choosing." 29 U.S.C. Sec. 157
 
 
 [5]
 Section 8(a)(3) forbids an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. Sec. 158(a)(3)
 
 
 [6]
 Section 8(a)(4) forbids an employer "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony" in a Board proceeding. 29 U.S.C. Sec. 158(a)(4)
 
 
 [7]
 The Company concedes that, under NLRB v. Allied Products Corp., 548 F.2d 644, 652 (6th Cir.1977), an employer violates its duty to bargain in good faith if it unilaterally discontinues an employment practice and only later offers to discuss reinstitution of the practice
 
 
 [8]
 See supra, note 5
 
 
 [9]
 See supra, note 6
 
 
 [10]
 As stated earlier, the Board found in the prior proceeding that the Company had 1) laid off Harrington because he led the Union's organizing campaign; 2) coercively interrogated employees about their union sympathies; 3) granted wage increases to discourage union support; and 4) restricted non-working time in the plant to inhibit free discourse
 
 
 [11]
 Only employees with three or more years of service were eligible
 
 
 [12]
 The fact that those statements were made in connection with negotiations directly concerning layoffs and IRA payments does not, as the Company contends, render them irrelevant to our search for the Company's rationale for refusing to agree to a wage increase. The statements provide a telling context out of which arose the Company's bargaining position on wages